## Richmond

WALTER R. C. STAMPER

V.

COMMONWEALTH OF VIRGINIA

Record No. 832043.

January 18, 1985.

Present: All the Justices.

Emmitt F. Yeary; Nancyjean Bradford (Yeary & Tate, P.C., on briefs) for appellant.

Robert Q. Harris, Assistant Attorney General (Gerald L. Baliles, Attorney General, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

In a bench trial, Walter R.C. Stamper was convicted of possession of 3.88 pounds of marijuana with intent to distribute, and was sentenced to six years' confinement. His appeal raises questions concerning a variance between the indictment and the proof, the refusal of the trial judge to recuse himself, entrapment, the admissibility of evidence to prove the defendant's mental state, the sufficiency of the evidence to prove intent to distribute, and alleged errors in sentencing.

The facts are undisputed. At the time in question, the defendant was an attorney practicing law in Southwest Virginia. Agents of the Commonwealth suspected him of receiving controlled substances in payment of fees from defendants charged with drug offenses. The Commonwealth's Attorney of Smyth County and several law enforcement officers made an agreement with a suspect named Joseph B. Lacy McClanahan, owner of an auto body shop at Glade Springs, in Washington County, that McClanahan wouldn't "get any time" as a result of a drug charge pending against him in Smyth County if he would help the Commonwealth obtain evidence against other suspects. Among other

things, the officials asked McClanahan to "find out what Mr. Stamper was into."

McClanahan called the defendant, told him he had been recommended by a client of the defendant, and said that he "needed a lawyer and wanted to talk to him." Stamper agreed to go to Mc-Clanahan's shop at Glade Springs on the afternoon of March 4, 1983. Before Stamper's arrival, a Virginia state trooper and an investigator for the Washington County Sheriff's Department gave McClanahan a white plastic bag containing 3.88 pounds of marijuana which had been confiscated in another case. They also "wired" McClanahan with a microphone and a radio transmitter concealed under his clothing. The officers hid themselves in a house adjacent to McClanahan's shop, where they had equipment which would receive McClanahan's conversations and record them on tape. With respect to the marijuana, McClanahan testified that the officers told him: " 'Don't you offer him nothing. You talk with him. You tell him you got it, don't offer it to him.' And I didn't."

The defendant drove to McClanahan's shop about 5:00 p.m. on March 4, 1983, accompanied by a man named Henderson. Stamper entered the shop while Henderson remained in Stamper's car, seated on the passenger side of the front seat. The officers overheard and recorded the conversation between Stamper and McClanahan, which was transcribed and admitted into evidence. In it, after discussing the details of McClanahan's "case," Mc-Clanahan said "I don't have much money right now, I've got some other stuff that I could get rid of . . . ." Stamper asked if he had any guns to trade. McClanahan said "No. I got about five pounds of pot." Stamper asked if it was "good pot" and "[h]ow much is it going for a pound?" McClanahan said he had never sold it by the pound. Stamper asked how much he was getting for an "O.Z." McClanahan said "forty bucks." Stamper examined it and agreed that it didn't "smell too bad." Stamper then said that his fee would be $5,000.00 to represent McClanahan, $2,500.00 for each of two "cases" McClanahan said were pending against him, one in Smyth County and the other in Washington County. Stamper then said, "I'd be happy to take that as a retainer if you wanted." McClanahan asked for, and Stamper gave him, a receipt, which is in evidence, reciting, "I, Walter R.C. Stamper, acknowledge receipt of $2500 cash from Lacy McClanahan for a retainer. An

additional $2500 is to be paid before completion of criminal charges in Washington County and Smyth County."

The officers watched through a window and took photographs as the defendant took the white plastic bag, containing the marijuana which was wrapped in six smaller plastic bags, reentered his car, handed the marijuana to Henderson, and drove away, southbound on Route 91. The officers followed in an unmarked car. They found Stamper's car parked on the right shoulder of the road, having turned east on Route 736. Stamper and Henderson were sitting in the car, and the large white plastic bag was visible near Henderson's feet, on the floor on the passenger side. The officers parked in front of the Stamper car, walked back to it, displayed an identification card, and announced that they were police officers. They opened the driver's door and told Stamper to get out. Stamper raced his car's engine, backed suddenly away, and then accelerated forward, striking one of the officers and striking their parked car as he sped away. The officers pursued in a high-speed chase. After about two miles the officers drew alongside Stamper and displayed their weapons. He came to a stop and surrendered.

The officers found a shotgun and two loaded revolvers in the defendant's car, but the marijuana was missing at the time of the arrest. Retracing the route of the chase, they found the large white plastic bag, still containing the six smaller bags of marijuana, lying on the right shoulder of the road — the side which would have been nearest the passenger during the chase.

The defendant was indicted for possessing, with intent to distribute, "three pounds of marijuana, more or less," in violation of "Section 18.2-248.1(a)(3)" of the Code. The cited subsection relates to possession, with requisite intent, of more than five pounds of marijuana, and fixes a penalty of five to thirty years' imprisonment for its violation. The preceding subsection, 18.2-248.1(a)(2), relates to possession, with requisite intent, of "more than one-half ounce but not more than five pounds of marijuana," which it penalizes as a class 5 felony, punishable by one to ten years' imprisonment, or alternative misdemeanor punishment; it would have been the proper section to cite to conform to the crime alleged in the indictment.

The defendant argues on appeal that the indictment is internally inconsistent and that a fatal variance occurred in that the evidence did not conform to the offense charged. This contention

has no merit. Rule 3A:6 provides that error in or omission of the citation of the statute on which the prosecution relies shall not be ground for dismissal of an indictment or reversal of a conviction, unless the court finds that such error "prejudiced the accused in preparing his defense." Here, the indictment stated the quantity of marijuana allegedly possessed with reasonable certainty, and there was no possibility of surprise or prejudice to the defendant. The certificate of laboratory analysis, upon which the Commonwealth relied to prove the exact quantity of marijuana in the white plastic bag, was filed in the general district court on March 23, 1983, nearly five months before trial. Indeed, the discrepancy in the indictment was called to the court's attention by defense counsel, who suggested that it be amended.

■ Moreover, the defendant made no objection on these grounds until the time of sentencing. The criminal statute of jeofails, Code § 19.2-227, requires that any such objection to an indictment, to be a ground for reversal, be made before verdict. Rule 3A:9 is even more restrictive, requiring that defenses and objections based upon defects in the indictment be raised only by motion to dismiss made before pleading and at least seven days before trial. Thus, even if the objection were valid, it came too late.

About two months before trial, defense counsel called the trial judge and asked if he intended to preside at the trial of the Stamper case. The judge responded that the defendant did not appear in his court with great frequency and that he saw no reason to recuse himself. Defense counsel pointed out that the defendant's mental state on March 4, 1983, might be an issue, and that Stamper had appeared as counsel in the judge's court that very day, a few hours before his arrest. The judge did not recall the occasion at the time of the conversation with counsel. No motion for recusal was made before or during trial, and the defense did not interpose an insanity plea.

No further reference was made to the matter of recusal until, on the twenty-first day after the entry of final judgment, the defendant appeared with new counsel and moved the court to set aside the judgment and grant a new trial on the ground that the trial judge should have recused himself *ab initio*. Among other things, this motion was based upon the theory that it was improper for the judge to preside at the trial because the defendant regularly practiced before him and because the judge had personal

knowledge of the defendant's mental state on the day of the offense, to which he made reference at the time of sentencing.

■ A trial judge must exercise reasonable discretion to determine whether he possesses such bias or prejudice as would deny a party a fair trial, but no issue of bias is raised merely by the judge's familiarity with a party through prior judicial proceedings. *Deahl* v. *Winchester Dept. Soc. Serv.*, 224 Va. 664, 672-73, 299 S.E.2d 863, 867 (1983). The Canons of Judicial Conduct provide that the judge should disqualify himself if "his impartiality might reasonably be questioned." Rules of Court, Part Six, Section III, Canon 3C(a). In exercising his discretion in this regard, the judge must be guided not only by the true state of his impartiality, but also by the public perception of his fairness, in order that public confidence in the integrity of the judiciary may be maintained. There is no indication in the record that the trial judge abused his discretion in this regard. The defendant's motion points to several adverse rulings at trial as indications that the judge was prejudiced against him. But if this were the criterion of prejudice, no rulings could ever be made which a party opposes. If a timely motion for recusal had been made, the trial court might have granted it out of an abundance of caution because of the defendant's law practice in the area. But the record contains no indication that the court's impartiality was reasonably subject to question.

■ At sentencing, the trial judge remarked that he had recalled the occasion of the defendant's appearance in his court on March 4, 1983, and that the defendant had won a case that day. The defendant argues that this is proof of the propriety of recusal, because the court was clearly biased against his claim to have been mentally impaired on that day, and that the issue of his mental state "was a fact in issue in this case." We disagree, for the reasons stated below, that the defendant's mental state on the day of the offense was at all relevant to the issue of his guilt. If an insanity plea had been made, and the judge had personal knowledge obtained outside the record of the facts bearing on that issue, the result would be different. Here, however, the record discloses no facts which would require that the judge recuse himself *sua sponte*.

■ The defendant made a pretrial motion to dismiss the prosecution on the ground that he was a victim of entrapment practiced by McClanahan, the Commonwealth's agent. We have

adopted the definition of entrapment given by the concurring opinion of Justice Roberts in *Sorrells* v. *U.S.*, 287 U.S. 435, 454 (1932): "Entrapment is the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer. . . ." *Falden* v. *Commonwealth*, 167 Va. 549, 555-56, 189 S.E. 329, 332 (1937). There is nothing improper in the use, by the police, of decoys, undercover agents, and informers to invite the exposure of willing criminals and to present an opportunity to one willing to commit a crime.

> A distinction is made between police conduct that merely affords an opportunity for the commission of an offense and "creative activity" that implants in the mind of an otherwise innocent person the disposition to commit an offense and induces its commission in order to prosecute. Where the police do no more than afford an opportunity for the commission of an offense a subsequent conviction will not be barred on the ground of entrapment.

*Johnson* v. *Commonwealth*, 211 Va. 815, 817-18, 180 S.E.2d 661, 663 (1971).

■ Here, McClanahan, obedient to his instructions, decoyed Stamper but exercised no persuasion upon him to take the marijuana in part payment of his fee. He merely described it as "some other stuff that I could get rid of." The offer to take it came from Stamper: "I'd be happy to take that as a retainer if you wanted." The fact-finder was entitled to infer that the disposition to commit the offense originated in Stamper's mind, rather than being implanted by McClanahan, because of his inquiries concerning its quality and quantity, his examination of its appearance and odor, his close questioning of its resale value, and his equating its value to a credit against the fees he quoted. The evidence clearly supports a finding that the officers provided an opportunity for Stamper to commit the offense, but equally supports a finding that he had the predisposition and propensity to commit it. *See U.S.* v. *Burkley*, 591 F.2d 903, 916 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 966 (1979). Thus, the court correctly ruled that the officers' conduct did not constitute entrapment.

■ The defendant contended at trial and on appeal that he had a right to introduce psychiatric testimony to prove that he was

manic-depressive, in a manic state on the date of the offense, and consequently incapable of forming the intent to distribute, which is a requisite element of the crime. At trial, the defense called Dr. Don Litton Weston, a psychiatrist, as a witness. Because the defendant had not interposed an insanity defense, the court refused to admit, on the issue of guilt, the testimony of this witness as to Stamper's mental state on March 4, 1983. The Court did, however, permit a full tender of the testimony of the witness for the record. This testimony was later transcribed and considered by the court in connection with sentencing.

In contending that his mental state, short of insanity, was relevant to the determination whether he was capable of entertaining the specific intent required for conviction, the defendant relies primarily upon *Rhodes* v. *United States*, 282 F.2d 59 (4th Cir. 1960). That case, however, evidently was premised upon a provision of a tentative draft of the Model Penal Code, which has never become a part of the law of Virginia. The use of expert evidence has been approved in some jurisdictions to show "diminished capacity," *see, e.g., U.S.* v. *Albright*, 388 F.2d 719, 723 (4th Cir. 1968), and in others to show, by circumstantial evidence, that the requisite specific intent did not in fact exist, *see, e.g., United States* v. *Brawner*, 471 F.2d 969, 998 (D.C. Cir. 1972). The first theory represents "a fundamental change in the common law theory of [criminal] responsibility," *Fisher* v. *United States*, 328 U.S. 463, 476 (1946), and we decline to adopt it. The second approach has been characterized in our holdings as an invasion, by expert opinion on the ultimate fact in issue, of the province of the factfinder. *Waye* v. *Commonwealth*, 219 Va. 683, 696, 251 S.E.2d 202, 210 (1979); *Painter* v. *Commonwealth*, 210 Va. 360, 367-68, 171 S.E.2d 166, 172 (1969).

There is, however, a more fundamental reason for the exclusion of such evidence. The state of knowledge in the fields of medicine and psychiatry is subject to constant advance and change. The classifications and gradations applied to mental illnesses, disorders, and defects are frequently revised. The courts cannot, and should not, become dependent upon these subtle and shifting gradations for the resolution of each specific case. *Fisher* v. *United States, supra; Wahrlich* v. *Arizona*, 479 F.2d 1137 (9th Cir.), *cert. denied*, 414 U.S. 1011 (1973). Instead, the common law, many years ago, fixed a stable and constant standard of mental competence as the criterion for the determination of criminal re-

sponsibility. A person whose mental state falls outside the borderline drawn by that standard is deemed legally insane. All persons inside that borderline are "presumed to be sane, and to possess a sufficient degree of reason to be responsible for [their] crimes." *Price* v. Commonwealth, 228 Va. 452, 457, 323 S.E.2d 106, 109 (1984) (quoting *M'Naghten's Case*, 10 Cl. and F. 200, 8 Eng. Rep. 718 (1843)). For the purposes of determining criminal responsibility a perpetrator is either legally insane or sane; there is no sliding scale of insanity. The shifting and subtle gradations of mental illness known to psychiatry are useful only in determining whether the borderline of insanity has been crossed. Unless an accused contends that he was beyond that borderline when he acted, his mental state is immaterial to the issue of specific intent. *See Johnson* v. *State*, 292 Md. 405, 439 A.2d 542 (1982); *Bethea* v. *United States*, 365 A.2d 64 (D.C. App. 1976), *cert. denied*, 433 U.S. 911 (1977). Accordingly, we hold that evidence of a criminal defendant's mental state at the time of the offense is, in the absence of an insanity defense, irrelevant to the issue of guilt. The trial court committed no error in excluding it at the guilt phase of the trial.

Stamper argues that, even if he had the mental competence to form intent, the evidence was insufficient to support a finding that he in fact possessed the marijuana with intent to distribute. We do not agree. He inquired as to its quality and its resale value by the pound and by the "O.Z." He agreed on a monetary credit reflecting this resale value. He was actually observed by the officers transferring possession of it to his companion, Henderson. When the officers stopped him, it was on Henderson's side of the car. When found at the roadside, it had evidently been thrown out of the car, during the chase, by Henderson, who thus assumed dominion over it. Further, when retrieved, the large bag containing the smaller parcels of marijuana also contained a cigarette paper, not present when McClanahan delivered the bag to Stamper, which bore Henderson's fingerprints. Henderson's prints also appeared on one of the smaller bags. From this evidence, the trier of fact was entitled to infer that Stamper not only intended to resell the marijuana by the pound or by the ounce, but that he also had actually made a distribution to Henderson. This was in itself sufficient. The intent accompanying an act is best evidenced by the actor's words and conduct. *See Banovitch* v. *Commonwealth*, 196 Va. 210, 216, 83 S.E.2d 369, 373 (1954).

At the time of sentencing, the Commonwealth argued for the maximum penalty of ten years. The defense argued that the offense was a "bizarre episode" in the defendant's life, influenced by his psychological problems and by certain medication he was taking to treat them. The court indicated that it had considered both the mitigating circumstance of the defendant's absence of prior criminal record and the aggravating circumstance that the offense was committed while the defendant was practicing law. For these reasons, the court declined to impose either the maximum or the minimum penalty, but fixed punishment at six years.*

The defendant then moved the court to suspend execution of the sentence and place the defendant on probation. The Commonwealth opposed the motion. The probation officer did not recommend probation. The court observed that the practice of law was akin to a sacred trust. The following colloquy took place:

> The Court: He's going to have to serve some time. I'm going to take your motion under advisement at this time on the suspension and order him sent to jail. And at a later date I will determine whether to grant your motion in part, in whole, or to deny it. So Mr. Sheriff, you may take charge of Mr. Stamper at this time.
> [Defense counsel]: Your Honor, please, we would make a motion that his bond continue while we perfect an appeal from Your Honor's ruling.
> The Court: Well, I — now, I take it you're going to appeal?
> [Defense counsel]: Yes, sir.
> The Court: Motion for probation is denied.
> [Defense counsel]: Alright, sir.
> The Court: Alright.
> [Defense counsel]: And the bond will continue?
> The Court: The bond may continue.

The defendant argues that the court clearly denied his motion to suspend the sentence and place him on probation because he invoked his constitutional right to seek an appeal, that the court was "without right to put a price on appeal" and that

---

*The defense argues on appeal that the trial judge's remarks indicate that he did not understand that he had the alternative option of imposing a jail term and a fine, and that the defendant was thus deprived of his right to a consideration of the full range of statutory penalties. Our examination of the record satisfies us that this conclusion is unwarranted.

the court's ruling put him "in the dilemma of making an unfree choice" between petitioning for appeal and seeking suspended execution of sentence with probation.

The Attorney General replies that the decision as to suspension and probation is a matter entirely within the trial court's discretion, pursuant to Code § 19.2-303, and that the exercise of such discretion comes to us armed with a strong presumption that it was made in conformity with the law. The Attorney General further argues that the record does not compel the conclusion for which the defendant contends; but rather, that the court proposed a continuance of the case, with the defendant committed to jail but not transported to the penitentiary because no final order would be entered. During the continuance, the court would give further thought to the advisability of probation. Thus, the defendant's bond would be revoked, but he would be unable to petition this Court for appeal for lack of an appealable final order. The entry of a final order would have frustrated the trial court's purpose because it would have caused the defendant to be transported to the penitentiary, thus ousting the court of jurisdiction, after 21 days, to suspend the sentence and admit the defendant to probation. *Va. Dept. Corr.* v. *Crowley*, 227 Va. 254, 316 S.E.2d 439 (1984). The defendant, the Attorney General continues, was obviously unwilling to accept the court's proposed course of action. Instead, the defendant indicated his preference for the prompt entry of a final, appealable order, and for the continuance of his bond pending appeal. Because that procedure was wholly inconsistent with the trial court's proposal, the Attorney General argues that the defendant can hardly be heard to complain if the trial court acceded to his wishes.

█ It is, of course, fundamental that the right to apply for an appeal from a final judgment of criminal conviction, in the manner prescribed by statute, is a constitutional right. *See Clark* v. *Peyton*, 207 Va. 444, 446, 150 S.E.2d 533, 535 (1966). The court may not attach a penalty to the exercise of that right, or require its waiver as the price of favorable treatment. *C.f. Bordenkircher* v. *Hayes*, 434 U.S. 357 (1978); *North Carolina* v. *Pearce*, 395 U.S. 711 (1969). We will not, however, assume that the trial court was unaware of these fundamentals, or that it ignored them. In the absence of a clear showing in the record that the court's motivation was to penalize the defendant for exercising his appel-

late rights, we are not compelled to reach such a conclusion. *State v. McLaurin*, 41 N.C. App. 552, 255 S.E.2d 299 (1979).

The procedural posture of the case, however, renders the issue moot. Finding no reversible error in the trial court's rulings on the issue of guilt or in fixing the quantum of punishment, we will affirm the judgment of conviction. Because the defendant's appearance bond has been continued in effect pending appeal, he has not been committed to the penitentiary. For this reason, his motion for a suspension of the sentence, with probation, is still within the court's jurisdiction by virtue of Code § 19.2-303 (substantially former § 53-272, repealed Acts 1982, c. 636). *Crowley*, 227 Va. at 259, 316 S.E.2d at 441. Because the defendant's constitutional right to petition this Court for appellate review of his conviction has now been fully exercised, there can now be no question that the disposition of his motion might be conditioned upon a waiver of that right. We think it advisable that any question be eliminated by remanding the case to the trial court for further consideration of the defendant's motion for suspension of sentence and probation, in light of the circumstances found to exist when the matter is heard.

*Affirmed and remanded.*

CARRICO, C.J., dissenting in part.

I would affirm this judgment across the board. Hence, I dissent from that portion of the majority opinion which, without a finding of reversible error, remands the case for "further consideration of the defendant's motion for suspension of sentence and probation."

The trial court's denial of the defendant's motion involved the exercise of judicial discretion. Under a settled rule, we will not disturb a trial court's exercise of discretion in the absence of a clear showing of abuse; however, there has been no clear showing of abuse in this case. Indeed, the majority admits as much when it states there is no "clear showing in the record that the [trial] court's motivation was to penalize the defendant for exercising his appellate rights."

Yet, the majority says a remand is "advisable" to eliminate "any question" concerning the disposition of the defendant's motion. I hope this will be the only time the Court remands a discre-

tionary matter because it deems such action "advisable" rather than necessitated by a finding of reversible error.