**Salem**

THOMAS FRANKLIN BOWLING

v.

COMMONWEALTH OF VIRGINIA

No. 1572-88-3

Decided April 2, 1991

COUNSEL

Royston Jester, IV (Jester and Jester, P.C., on brief), for appellant.

Leah A. Darron, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KEENAN, J.**—Thomas Bowling appeals his convictions in a bench trial for capital murder and use of a firearm during the commission of murder. He raises the following issues on appeal: (1) whether the trial court erred in prohibiting him from introducing evidence of his mental capacity at the time of the offense; (2) whether the evidence was sufficient to establish premeditation; (3) whether the trial court erred in admitting statements made by the victim immediately after the shooting, under the excited utterance exception to the hearsay rule; (4) whether the trial court erred in admitting statements made by the victim while at the hospital, under the dying declaration exception to the hearsay rule; and (5) assuming that the victim's statements at the hospital were admissible, whether the trial court erred in relying on these statements in determining his guilt on the firearms charge. We find no error in the rulings of the trial court and accordingly affirm Bowling's convictions.

## I.

This case arises from a robbery at a Fisca Station on Timberlake Road in Lynchburg on December 24, 1987. The victim, Glenn West, was the manager of the station.

At 8:13 p.m., West called the Lynchburg 911 operator and stated that he had been shot in the stomach with either a .25 or a .32 and robbed by a black male who ran off in the direction of the Fort Cinema. Kim Layne, another 911 operator, called West back at 8:16 p.m. A tape of the first 911 call was admitted into

evidence.

Mrs. West arrived at the station at 8:25 p.m. pursuant to arrangements she had made with West earlier in the day. When she arrived, there were several police vehicles, an ambulance, and medical personnel at the station. West was inside, lying on his back. West was taken out of the station on a stretcher. Mrs. West testified that he was in great pain at the time.

While at the hospital, West told his wife that he could not breathe. He asked her to say a prayer for him and requested a minister, requests that Mrs. West stated were out of character for West since he was not a religious person. West then told her that he was cold and that he could not stand the pain in his stomach.

After Mrs. West wrapped a blanket around him, he wished her Merry Christmas and told her that the presents for her and their daughter were on the table at the station. Mrs. West told him they would wait Christmas until he got home, but West responded that he would not see Christmas. Mrs. West testified that she begged him not to die. West told her to take care of their daughter and go on the best that they could. He then called his daughter over, wished her a Merry Christmas, and told her to be strong and take care of her mother.

While West was talking with his daughter, the minister arrived. West told the minister that he wanted to be saved and they prayed together. Mrs. West testified that she had never seen her husband pray before. Shortly thereafter, Officer McCane spoke with West about the robbery at the station.

West was then taken into surgery. He did not regain consciousness after surgery and died at approximately 2:50 a.m. The cause of death was determined to be hemorrhage and shock secondary to a .25 caliber gunshot wound to the abdomen.

While at the hospital, West told his wife that the robber had called him by name and knew that he was the manager of the station. When Officer McCane spoke with West, West indicated that while he was waiting for his wife to pick him up at the station, he saw somebody walking across the station driveway. The individual called West by name, asked him if he was the manager, and then asked him if he could open the safe. West told the individual that he was the manager but that he could not open the

safe.

West informed McCane that the robber then told West to open the safe or he would shoot him. West told the robber that he could not open the safe because it had a time delay lock on it. The robber again told West to open the safe or he would shoot him. West begged the robber not to shoot him, then reached into his pocket and gave him approximately $50 that he had in his pocket. He again told the robber that he could not get the safe open and begged him not to shoot. The robber responded, "Well, I guess I will have to kill you then," and shot West in the stomach.

West described the individual who shot and robbed him as wearing a dark jacket and blue jeans, with short hair and no facial hair. He said the robber had a .32 or .25 automatic pistol and that he did not remember having seen the individual prior to that evening. West also told McCane that he saw a yellow van with mag wheels and some type of rack on top go up and down the street several times.

Steve Johnson testified that several days before Christmas Eve, he had spoken with Dock Hall about robbing the Fisca station. On the morning of the robbery, Hall, James Ward, Bowling and Tracy Brown pulled up in a yellow van and Brown told Johnson that Bowling had agreed to rob the station. About 7:00 p.m. that evening, Hall and Ward picked up Johnson and Brown in the van and drove to pick up Bowling. Thereafter, Ward drove the van to the Fort Cinema, circled around the parking lot a few times and parked across the street from the Fisca station.

While they were all in the van, Hall told Bowling that the manager's name was West. Hall also told Bowling that after the robbery, he should run through the Cinema, go across the parking lot, and meet the van in front of the church. Ward gave Bowling a gun and told him that it was loaded. The gun was not cocked when Ward gave it to Bowling. Johnson testified that Bowling asked Hall: "What if I have to jinx him?" Hall responded: "I am not telling you to shoot him, but if you have to shoot him. . . ."

Bowling exited the van and crossed the street toward the station. Ward drove the van from the Fort Cinema to the church. Within five or six minutes, Bowling returned to the church. He told Hall that several customers came into the station so he just

bought a soda and left. After some discussion, Bowling agreed to try again.

After Bowling left, Ward drove the van along Timberlake Road, passing the station several times, before returning to the church. Bowling came back to the van, threw about $50 on the table and stated that he shot West. He told the others that West could not open the safe because it had some kind of lock on it. Bowling then gave the gun to Hall, who unloaded it. Johnson testified that as he unloaded the gun, Hall indicated that he had loaded the gun with seven rounds and only four remained.

Officer McCane spoke with Bowling at the Lynchburg police department on January 22, 1988. A tape recording of the conversation was admitted into evidence. Bowling told McCane that Ward, Hall and Brown picked him up in a black and yellow van on Christmas Eve. They drove over to the Fort Cinema, across the street from the Fisca station and Ward gave Bowling a .25 automatic.

Bowling stated that when he encountered West outside the station, he told him to open up the safe. Bowling indicated that he had the gun by his side. West told him that the safe could only be opened in the morning. Bowling again told West to open the safe, and West said that he could not. Bowling then asked West how much money he had in his pocket. West said about $45. Bowling told West to give him the money. He stated that as he was putting the gun back into his pocket, it went off, hitting West in the stomach. Bowling then ran across the street to the cinema and cut through the church yard.

Prior to trial, Bowling moved the trial court to admit evidence at trial concerning his mental state at the time of the offense. Counsel proffered that the evidence she sought to admit included the fact that Bowling functioned at the lower limits of the borderline range of the Adult Intelligence Scale and that Bowling did not have developed problem solving skills or elaborate abstract thinking capability. The trial court denied Bowling's motion.

## II.

Bowling argues that the trial court erred in denying his motion to introduce psychiatric evidence bearing on his mental state at the time of the offense. He claims that evidence of diminished ca-

pacity is relevant to the elements of premeditation and deliberation involved in capital cases. Thus, the trial court should have considered evidence of Bowling's borderline mental capacity in determining whether or not he acted with premeditation.

In *Stamper v. Commonwealth*, 228 Va. 707, 324 S.E.2d 682 (1985), the Supreme Court held:

> For the purposes of determining criminal responsibility a perpetrator is either legally insane or sane; there is no sliding scale of insanity. The shifting and subtle gradations of mental illness known to psychiatry are useful only in determining whether the borderline of insanity has been crossed. Unless an accused contends that he was beyond that borderline when he acted, his mental state is immaterial to the issue of specific intent.

*Id.* at 717, 324 S.E.2d at 688. Stamper sought to introduce evidence that he was a manic-depressive who was in a manic state on the date of the offense and that this mental condition rendered him incapable of forming the intent to distribute narcotics.

Bowling argues that this case is distinguishable from *Stamper* because the evidence he sought to introduce was intended to negate the element of premeditation. He argues that the Supreme Court has previously recognized proof of voluntary intoxication as a defense to premeditation in capital and first degree murder cases, even though this exception is not available to other specific intent crimes. He argues that diminished capacity is a similar defense to the element of premeditation and thus evidence tending to establish this defense should have been admitted at trial.

In *Smith v. Commonwealth*, 239 Va. 243, 389 S.E.2d 871, *cert. denied*, 111 S. Ct. 221 (1990), decided after the filing of the briefs and oral argument in the case before us, the Supreme Court rejected a similar argument. In *Smith*, defense counsel sought to introduce psychiatric evidence to establish that, although Smith had the ability to form intentions and to premeditate, he did not have the capacity to follow through on his intentions. The trial court refused to admit the evidence at trial. On appeal, counsel claimed that the diminished capacity evidence he sought to introduce was being introduced for the same purpose as evidence of voluntary intoxication, namely, to negate specific intent or pre-

meditation. The Supreme Court affirmed the trial court's refusal to admit the evidence, stating:

> *Stamper* provides the reason for excluding the type of evidence Smith champions. There, we said:
>
>> The state of knowledge in the fields of medicine and psychiatry is subject to constant advance and change. The classifications and gradations applied to mental illnesses, disorders, and defects are frequently revised. The courts cannot, and should not, become dependent upon these subtle and shifting gradations for the resolution of each specific case.

*Id.* at 260, 389 S.E.2d at 880.

In the case before us, Bowling sought to introduce evidence that he functioned at the lower limits of the adult intelligence range. At no time, however, did he put his sanity at issue nor did he present evidence in support of a finding that he was legally insane. Accordingly, in the absence of any claim of insanity, we find that the trial court did not err in denying Bowling's motion to introduce psychiatric evidence as to his mental state at the time of the offense.

Bowling also argues that Code § 18.2-31(d) requires the Commonwealth to prove beyond a reasonable doubt that Bowling killed West willfully, deliberately and with premeditation while in the commission of a robbery. Bowling maintains that the evidence offered by the Commonwealth was insufficient to establish premeditation because the Commonwealth did not prove that Bowling intended to kill West. We disagree.

The question of premeditation is a question to be determined by the fact-finder. *Peterson v. Commonwealth*, 225 Va. 289, 295, 302 S.E.2d 520, 524, *cert. denied*, 464 U.S. 865 (1983). "To establish premeditation, the intent to kill need only exist for a moment." *Id.* The Commonwealth's evidence included West's statements to his wife that his assailant repeatedly told him to open the safe or he would shoot. West also told his wife that when he failed to open the safe, the assailant stated, "I guess I will have to kill you then," and shot West in the stomach. In addition, Steve Johnson testified that prior to attempting the robbery, Bowling

discussed with Hall the possibility of shooting West. Furthermore, Johnson testified that, although the gun Hall gave to Bowling was loaded, it was not cocked. Bowling told Officer McCane that he cocked the gun himself on the way to the station. Finally, both Johnson and Tracy Brown testified that when Bowling returned to the van, he said to the others: "I had to shoot him."

■ "On appeal, we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it." *Martin v. Commonwealth*, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987) (citing Code § 8.01-680). On the record before us, we find that there is ample evidence to support the trial court's finding that the shooting was premeditated.

Bowling next argues that the trial court erred in admitting the tape of West's initial conversation with the 911 operator. He claims that the Commonwealth failed to meet its burden of proving that the statements on the tape were "excited utterances." Bowling stresses that all but one of the statements made by West were made in response to questions posed by the 911 operator and were, therefore, outside the definition of an excited utterance.

■ The rule in Virginia is that "[e]xcited utterances prompted by a startling event, and not the product of premeditation, reflection, or design, are admissible, but the declaration must be made at such time and under such circumstances as to preclude the presumption that it was made as the result of deliberation." *Goins v. Commonwealth*, 218 Va. 285, 287, 237 S.E.2d 136, 138 (1977). The burden is on the Commonwealth to show that the statements are admissible. *See Doe v. Commonwealth*, 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984).

■ In order to determine whether the Commonwealth has met this burden, a court must look to the lapse of time between the event and the declaration, whether the statement was made spontaneously or in response to questions, and whether the statements were an admission against interest rather than self-serving declarations. *Id.* at 471-72, 318 S.E.2d at 385 (citations omitted). "The ultimate test, [however], is whether it appears that 'the facts are

talking through the party or . . . the party is talking about the facts.' " *Id.* (quoting *Upton v. Commonwealth*, 172 Va. 654, 659, 2 S.E.2d 337, 339 (1939)).

In the case before us, West told Officer McCane at the hospital that after he was shot, he went into the office and called 911. The call was placed at approximately 8:13 p.m. Bowling told Officer McCane that the robbery occurred around 8:00 p.m. or a little after. Bowling also told McCane that after he shot West, he ran from the station back to the van. Steve Johnson testified that, by the time Bowling reached the van, they had already heard on a police scanner that West had been shot. From this evidence, the trial court properly concluded that West's call to 911 was made within minutes of the shooting.

Bowling argues that this is not determinative of the issue of admissibility because all but West's initial statements to the 911 operator were made in response to questions. Thus, he argues that they were not sufficiently spontaneous to be admitted under the excited utterance exception to the hearsay rule.

The conversation between West and the 911 operator was as follows:

911 OPERATOR: Lynchburg 911, Bailey.
WEST: Yes, this is Glenn West, Fisca station on Timberlake Road.
911 OPERATOR: Uh huh.
WEST: I've just been shot and robbed, in the stomach.
911 OPERATOR: Okay; you're where now?
WEST: Fisca station, 7237 Timberlake Road.
911 OPERATOR: Okay; you've been shot in the stomach?
WEST: Yes, sir, one black male, headed to the Fort Cinema.
911 OPERATOR: What was he driving?
WEST: He was running. He shot me with a .25 or .32.
911 OPERATOR: Black male?
WEST: Yes, sir.
911 OPERATOR: Headed towards the Fort Cinema?
WEST: Yes, sir.
BAILEY: Okay, we'll get somebody down there.
WEST: Thank you, sir.

■ In *Martin v. Commonwealth*, 4 Va. App. 438, 358 S.E.2d 415 (1987), a panel of this court stated: " 'To pivot the admissibility of a subsequent statement, however spontaneous, on the questions of whether it was prompted by an equally spontaneous inquiry would serve no useful purpose.' If the question or questioner suggested or influenced the response, then the declaration may lack the necessary reliability to be admitted." *Id.* at 442, 358 S.E.2d at 418 (quoting *People v. Edwards*, 47 N.Y.2d 493, 498-99, 392 N.E.2d 1229, 1232, 419 N.Y.S.2d 45, 48 (1979)). Considering the reliability of the statements in accordance with this standard, we find that West's statements were neither suggested by nor influenced by the questions posed by the 911 operator. While several of the statements were in direct response to the operator's questions, West's description of his assailant, the destination of the assailant, and the weapon involved were made without prompting from the 911 operator. The only information resulting from prompting by the operator was West's location and the fact that his assailant was on foot, not driving a vehicle.

■ In *Clark v. Commonwealth*, 235 Va. 287, 367 S.E.2d 483 (1988), the Supreme Court concluded that "[t]here is no fixed rule by which the question whether the statement is admissible as an excited utterance can be decided. Resolution of the issue depends on the circumstances of each case and 'rests within the sound judicial discretion of the trial court.' " *Id.* at 292, 367 S.E.2d at 486 (quoting *Huffman v. Commonwealth*, 168 Va. 668, 681, 190 S.E. 265, 271 (1937)). Thus, the Court determined that statements made by a gunshot victim as to his assailant's identity, while the victim was mortally wounded and suffering from the trauma of the shooting, were admissible as excited utterances even though the statement was prompted by a question some five to ten minutes after the shooting. *See also Harris v. Commonwealth*, 8 Va. App. 424, 430, 382 S.E.2d 292, 295-96 (1989) (statements made by gunshot victim within ten minutes of the shooting while victim lay fatally wounded are admissible as "excited utterances" even though the victim made the statements in response to questions).

Upon consideration of all the circumstances surrounding West's statements to the 911 operator, we find that the trial court did not abuse its discretion in admitting the taped conversation under the excited utterance exception to the hearsay rule. At the time the

statements were made, West was calling for help as he lay mortally wounded from a gunshot. West spoke with the 911 operator no more than ten minutes after the shooting and all the descriptive information regarding both his injury and his assailant was given spontaneously and not in response to direct questions posed by the operator. Officer Londeree arrived within minutes of the 911 call and found West lying on his back in the station holding his bleeding stomach. Mrs. West testified that ten minutes later, when she arrived, West was in great pain. Based on the foregoing evidence, we find that West's statements to the 911 operator were not the result of premeditation, reflection or design, but a reaction to the startling events which resulted in West's death several hours later. Accordingly, the trial court did not err by admitting the tape of West's initial conversation with the 911 operator into evidence pursuant to the excited utterance exception to the hearsay rule.[1]

Bowling likewise argues that the statements made by West to his wife while in the hospital emergency room were not admissible as dying declarations because the Commonwealth did not clearly establish that West had given up all hope of recovery at the time the statements were made. For the reasons set forth in the panel opinion in *Hall v. Commonwealth*, 12 Va. App. 198, 204, 403 S.E.2d 362, 366 (1991), we find no error in the trial court's ruling that the statements were admissible under the dying declaration exception to the hearsay rule.[2]

Bowling argues in the alternative that the statements, if admissible, were improperly considered by the trial court with respect to his guilt or innocence on the use of a firearm indictment, since dying declarations are admissible only in a homicide prosecution. We disagree.

---

[1] Bowling also asserts that the trial court erred when it admitted testimony by Janice West as to a conversation with her husband earlier that day. He argues that since the conversation occurred prior to the shooting, it was outside the scope of an excited utterance. A review of the record indicates that no objection of this nature was raised at trial. Accordingly, we do not address that issue on appeal. Rule 5A:18.

[2] The Commonwealth also argues that Bowling waived his objection to the admissibility of West's statements at the hospital because he introduced similar evidence through the testimony of Nurse Holland. Because we find that West's statements were admissible under the dying declaration exception to the hearsay rule, we do not address the issue of waiver.

■ In order to sustain a conviction for use of a firearm in the commission of a felony pursuant to Code § 18.2-53.1, the underlying felony must be proven beyond a reasonable doubt. *Davis v. Commonwealth*, 4 Va. App. 27, 31, 353 S.E.2d 905, 907 (1987), *appeal denied*, 365 S.E.2d 334 (1988). Thus, in the case before us, proof of West's murder was an essential element in the separate charge of use of a firearm in the commission of murder.

■ The rule governing the admissibility of dying declarations has been stated as follows: "Dying declarations are admissible only in cases of *homicide*, when made by the person injured touching the cause of his death, while actually *in extremis* and *conscious that he is so*, under a sense of *impending death*, and without any expectation or hope of recovery." *Compton v. Commonwealth*, 161 Va. 980, 984, 170 S.E. 613, 615 (1933). *See also Batten v. Commonwealth*, 190 Va. 235, 243, 56 S.E.2d 231, 235 (1949); *Thomas v. Commonwealth*, 183 Va. 501, 508, 32 S.E.2d 711, 714 (1945). Since the Commonwealth was required to prove the homicide as part of the firearm conviction, the dying declarations were properly considered by the trial court in its determination of Bowling's guilt or innocence on that charge.

For these reasons we affirm the decision of the trial court.

*Affirmed.*

Koontz, C.J., and Moon, J., concurred.