COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Frank
Argued at Chesapeake, Virginia


CLIFTON McNAIR, JR.

                                    MEMORANDUM OPINION* BY
v.    Record No. 0062-00-1          JUDGE ROBERT P. FRANK
                                        DECEMBER 5, 2000
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
                    Wilford Taylor, Jr., Judge

         Charles E. Haden for appellant.

         H. Elizabeth Shaffer, Assistant Attorney
         General (Mark L. Earley, Attorney General, on
         brief), for appellee.


     Clifton McNair, Jr., (appellant) was convicted in a bench

trial of first-degree murder in violation of Code § 18.2-32,

stabbing during the commission of a felony in violation of Code

§ 18.2-53, and petit larceny in violation of Code § 18.2-96.  He

appeals only the first-degree murder conviction, contending the

trial court erred in determining that, despite his mental

illness, he had the requisite intent, malice, and premeditation

to be guilty of first-degree murder.  For the reasons stated

herein, we find no error and affirm the conviction.

_____

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

I.  BACKGROUND

On February 18, 1999, appellant and Lucretia Smith (victim) both worked as cashiers at the Allright Parking Garage in Hampton. Appellant worked from 7:00 a.m. to 1:30 p.m., and the victim worked from 1:30 p.m. to 7:00 p.m.

At approximately 3:00 p.m., Officer Brian LePage of the Hampton Police Department heard screams coming from the parking garage.  He looked in the direction of the garage and saw the victim and appellant run out of the garage and stop at the end of the garage's driveway, almost in the lane of traffic.  Appellant, who was behind the victim, lifted his arms and stopped her. Appellant's arms were "out reached."

LePage momentarily looked away and when he turned back, he noticed the victim had broken free from appellant.  She ran into the second lane of traffic and collapsed in the middle of the street.

Casey Seals had just driven up when she, too, heard the screams and saw the victim run out of the parking garage with appellant behind her, his hands restraining her.  Seals watched as the victim pulled away to free herself and then saw them struggle for a few seconds.  Then, appellant looked around and let her go. The victim took four or five steps and then collapsed in the street.

LePage ran over to the victim and picked up her head.  He noticed a little blood on her back around her waistline.  He then

-

noticed some blood dripping from her mouth.  The victim's eyes rolled back and her head "just collapsed down."  When LePage put her head on the ground, he noticed "all the blood on her back."  A big pool of blood was starting "to surround her whole body."

LePage started back toward the garage and issued a "be on the lookout" for an individual wearing a red and black jacket, a red ball cap, and dark colored pants.  When LePage entered the garage, he noticed an individual who was the same size as the suspect. The individual fled.  Officer Michael Anderson, shortly thereafter, radioed LePage indicating he had a suspect in custody that fit the description.  Officer Anderson encountered the man who fit the description issued by LePage "walking in a calm manner" toward Lincoln Street.  Despite appellant's apparently calm manner, Anderson noticed he was breathing very fast and very deeply.  Realizing appellant was the suspect, Anderson stopped him.  Officer LePage then arrived and identified appellant as the person he saw struggling with the victim.  LePage identified appellant less than five minutes after appellant fled from the garage.

Officer Anderson noticed blood on the palms of appellant's hands.  After appellant was handcuffed, Officer Christopher Lyon patted him down for weapons and found a twelve-inch knife tucked in his left sleeve between his shirt and his jacket.  He, too, saw blood on appellant's hands.  Appellant was arrested and gave the police "pertinent information."

-

After appellant was arrested and advised of his Miranda rights, he waived his rights and confessed to Detective George Burton. He told Burton he left work at the parking garage at approximately 1:30 p.m., went to cash his paycheck, and then returned to the parking garage to pick up his clippers and a newspaper. At that point, the victim asked him about his trip to New Jersey. He told Burton he felt the victim was "getting personal into his business" and that she had been teasing him by shaking her rear end at him. He told Detective Burton he had been thinking about hurting her if she continued to tease him. Appellant told Burton he was tired, had been awake a long time, and he just snapped and stabbed the victim several times.

Appellant then provided a written statement. In his written statement, appellant said he was trying to get his shaving materials so he could leave, but the victim was flirting with him. Appellant said he got tired of the flirting and "went off." Then, in a more detailed question and answer statement, appellant said he had been carrying the knife on him because "he had been jumped before." He kept the knife in his left sleeve. He stated that the victim got into his business and he just "snapped" and stabbed her twice. Appellant explained, "I was tired. And I wanted to leave. But she kept talking to me and would not let me leave. She asked me about my trip. She asked me did I have a good time. I told her yes." The victim was standing in the booth of the parking garage. When appellant approached her, "she stood up and

-

turned away from me."  He wrote that upon being stabbed, the victim ran to the street.  Appellant took $50 out of the garage's cash tray and fled.

Appellant denied he planned to stab the victim when he returned to the parking deck or that he had thought and planned to hurt her before that date.  He also wrote that the last time he had slept was four days earlier, that his feet and hands hurt and that his blood sugar was elevated.  Appellant expressed remorse for his acts and cooperated with the police.

During the majority of the time that Detective Burton interviewed appellant, he was "quiet, coherent, calm."  Only once did he briefly cry.  This occurred when he learned the victim had died.  At all other times during the interview appellant was quiet but responsive to the questions.

Prior to trial on March 1, 1999, an order was entered directing that appellant undergo a psychological evaluation to be performed by Dr. Richard B. Griffin.  On May 18, 1999, a second psychological evaluation was ordered and was performed by Evan S. Nelson, Ph.D.  On September 9, 1999, appellant filed a notice of intention to assert at his trial that he lacked mental competency at the time of the offense.

In his written report dated June 1, 1999, made part of the trial record without objection, Dr. Nelson, a forensic psychologist, opined that appellant was competent to stand trial and concluded:

-

In the final analysis, it is the opinion of the undersigned from the data available at this time that Mr. McNair had some symptoms of mental illness at the time of the offense, but they did not prevent him from rationally understanding what he was doing nor did they destroy his ability to control himself.

Dr. Nelson listed four issues that "combine[d] to explain [appellant's] mental state:" 1) depression, 2) substance abuse, 3) post-traumatic stress disorder (TSD) following a robbery the day before the murder, and 4) diabetes – "if his blood sugar was low, it could have led to greater mental confusion . . . ."

Dr. Griffin, a Licensed Clinical Psychologist, examined appellant prior to trial and concluded:

It is the opinion of this writer that the defendant, Clifton McNair, was not suffering from a mental disease or defect at the time of the alleged offense which significantly impaired his capacity to understand the nature, character, and consequences of his actions. It is very likely that his judgement and his capacity for adequate impulse control were seriously compromised by sleep deprivation (due to his use of crack cocaine) at the time of the alleged offense. However, the voluntary ingestion of a mind-altering substance does not constitute a mental illness. There does not appear to be compelling evidence that his capacity to distinguish between right and wrong was significantly impaired by a mental illness at the time of the alleged offense. Thus, the requirements for a legal insanity defense do not appear to be fulfilled.

In his report, Dr. Nelson stated that appellant's Intelligence Quotient is "probably higher than the estimate of 60 reported . . . ." He also wrote that appellant's "capacity for

-

independent functioning was consistent with at least Borderline Intelligence, and clearly better than that typically associated with mental retardation."  Nelson indicated that appellant reported he was either intoxicated on cocaine or just "coming down" at the time of the offense.

Appellant, at trial, did not take the position that he was insane at the time of the offense.  Rather, in his motion to strike, he argued that because of his mental illness he lacked the requisite intent, malice, and premeditation to be found guilty of first-degree murder.

## II.  ANALYSIS

In contending he did not have the requisite intent, malice, or premeditation to be guilty of first-degree murder due to his "mental illness," appellant maintains he was motivated by "heat of passion" and provocation, not malice.  He argues that because he "snapped" and acted impulsively, he did not premeditate the stabbing.  He also contends that, by virtue of his mental illness, he lacked the requisite intent to commit murder, arguing "irresistible impulse."[1]

Essentially, appellant contends his mental illness, depression, post-traumatic stress syndrome, drug addition, and diabetes created a defect of reason such that he lacked the

---

[1] Because appellant raises "irresistible impulse" for the first time on appeal, we will not consider the argument on that issue.  Rule 5A:18.  The record does not establish a reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

requisite intent, malice aforethought, and premeditation necessary for first degree murder.

The Supreme Court of Virginia and this Court have addressed this issue on a number of occasions. In Stamper v. Commonwealth, 228 Va. 707, 715-16, 324 S.E.2d 682, 687 (1985), Stamper did not present evidence that he was insane, but attempted to introduce psychiatric testimony that he was manic-depressive and in a depressive state on the date of the offense and, therefore, incapable of forming the requisite intent to distribute. The trial court refused to consider such evidence. Id. at 716, 324 S.E.2d at 687. The Supreme Court wrote:

> For the purposes of determining criminal responsibility a perpetrator is either legally insane or sane; there is no sliding scale of insanity. The shifting and subtle gradations of mental illness known to psychiatry are useful only in determining whether the borderline of insanity has been crossed. Unless an accused contends that he was beyond that borderline when he acted, his mental state is immaterial to the issue of specific intent. Accordingly, we hold that evidence of a criminal defendant's mental state at the time of the offense is, in the absence of an insanity defense, irrelevant to the issue of guilt.

Id. at 717, 324 S.E.2d at 688 (citations omitted).

In Smith v. Commonwealth, 239 Va. 243, 259-60, 389 S.E.2d 871, 879-80 (1990), the Supreme Court applied Stamper in upholding the rejection of mental state evidence intended to show lack of premeditation where no insanity defense was raised. See also Bowling v. Commonwealth, 12 Va. App. 166, 173, 403 S.E.2d 375, 379

-

(1991) (absent an insanity defense, Stamper precludes the admission of testimony regarding defendant's mental state on issue of premeditation).

Therefore, all that remains of appellant's contention is a simple challenge to the sufficiency of the Commonwealth's evidence to prove malice, premeditation, and a specific intent to kill the victim.

"Murder . . . by willful, deliberate, and premeditated killing . . . is murder of the first degree."  Code § 18.2-32.  "'To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder.'"  Rhodes v. Commonwealth, 238 Va. 480, 485, 384 S.E.2d 95, 98 (1989) (quoting Smith v. Commonwealth, 220 Va. 696, 700, 261 S.E.2d 550, 553 (1980)).  "To prove premeditated murder, the Commonwealth must establish:  '(1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent.'"  Archie v. Commonwealth, 14 Va. App. 684, 689, 420 S.E.2d 718, 721 (1992) (quoting Rhodes, 238 Va. at 486, 384 S.E.2d at 98).

"'To establish premeditation, the intent to kill need only exist for a moment.'"  Bowling, 12 Va. App. at 173, 403 S.E.2d at 379 (quoting Peterson v. Commonwealth, 225 Va. 289, 295, 302 S.E.2d 520, 524 (1983)).  The question of premeditation is a question to be determined by the fact finder.  Peterson, 225 Va.

-

at 295, 302 S.E.2d at 524.  Moreover, "evidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference from which the trier of fact may conclude that the killer acted with premeditation."  Morris v. Commonwealth, 17 Va. App. 575, 578, 439 S.E.2d 867, 869-70 (1994) (citing Hodge v. Commonwealth, 217 Va. 338, 343, 228 S.E.2d 692, 696 (1976)).

"'Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.  It may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury.'"  Hernandez v. Commonwealth, 15 Va. App. 626, 631, 426 S.E.2d 137, 140 (1993) (quoting Dawkins v. Commonwealth, 186 Va. 55, 61, 41 S.E.2d 500, 503 (1947)).  "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation."  Branch v. Commonwealth, 14 Va. App. 836, 841, 419 S.E.2d 422, 426 (1992) (citation omitted).

The evidence established that appellant acquired the murder weapon at least a week before the stabbing.  While appellant maintained that he armed himself because he "had been jumped before," the robbery he complained of occurred the night before the victim was stabbed.  Appellant told Burton he had thought about hurting the victim if she continued to tease him.  When the victim made an inquiry about appellant's trip to New Jersey, appellant stabbed her in anger after she turned her back to him.

-

After the stabbing, the victim fled to the street, pursued by appellant.  Appellant then grabbed her and she had to struggle to break free from him.  Appellant then fled from the scene.

The evidence clearly proved appellant's specific intent to kill.  "Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case."  Ridley v. Commonwealth, 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979).  Intent to kill requires that:

> "'the killing should have been done on
> purpose, and not by accident, or without
> design; that the accused must have reflected
> with a view to determine whether he would
> kill or not, and that he must have determined
> to kill as the result of that reflection,
> before he does the act . . . .'"

Pannill v. Commonwealth, 185 Va. 244, 255, 38 S.E.2d 457, 463 (1946) (citations omitted).  "It is the will and purpose to kill, not necessarily the interval of time, which determine the grade of the offense."  Akers v. Commonwealth, 216 Va. 40, 48, 216 S.E.2d 28, 33 (1975) (citing Fuller v. Commonwealth, 201 Va. 724, 730, 113 S.E.2d 667, 672 (1960)).

Appellant contends provocation by the victim caused him to "snap" and stab her at least two times.  The victim's question to appellant was not reasonable provocation.  "To reduce a homicide from murder to voluntary manslaughter, the killing must have been done in the heat of passion and upon reasonable provocation."  Barrett v. Commonwealth, 231 Va. 102, 105-06, 341 S.E.2d 190, 192 (1986) (citing Martin v. Commonwealth, 184 Va. 1009, 1016-17, 37

-

S.E.2d 43, 46 (1946)).  "Virginia has long recognized that malice and heat of passion [are mutually exclusive]."  Hodge, 217 Va. at 345, 228 S.E.2d at 697.  Heat of passion refers to "the furor brevis, which renders a man deaf to the voice of reason . . . ."  Hannah v. Commonwealth, 153 Va. 863, 870, 149 S.E. 419, 421 (1929).  "Heat of passion is determined by the nature and degree of the provocation and may be founded upon rage, fear, or a combination of both."  Barrett, 231 Va. at 106, 341 S.E.2d at 192 (citations omitted).

"'A reasonable provocation is always necessary to reduce a [murder] . . . to . . . manslaughter; and especially where the offense is committed with a deadly weapon.'"  Martin, 184 Va. at 1017, 37 S.E.2d at 46 (citation omitted).  In Virginia, it is a long-standing principle that "words alone are never a sufficient provocation" for one to kill another and claim that the act arose from the heat of passion.  Id. at 1018, 37 S.E.2d at 47. "[W]hether a killing was done in the heat of passion upon reasonable provocation is a question of fact."  Canipe v. Commonwealth, 25 Va. App. 629, 643, 491 S.E.2d 747, 754 (1997) (citation omitted).

The trial court could reasonably infer from the evidence that appellant armed himself with a deadly weapon and harbored resentment toward the victim.  The evidence was sufficient to prove beyond a reasonable doubt that appellant willfully,

-

deliberately, and with premeditation stabbed the victim without reasonable provocation.

For these reasons, we affirm appellant's conviction of first degree murder.

<u>Affirmed</u>.