PRESENT:  All the Justices

ROSCOE JAMES SHAW

                                               OPINION BY

v.  Record No. 240212                    JUSTICE WESLEY G. RUSSELL, JR.
                                          APRIL 17, 2025

COMMONWEALTH OF VIRGINIA

### FROM THE COURT OF APPEALS OF VIRGINIA

Roscoe James Shaw was convicted of maliciously concealing a dead body in violation of Code § 18.2-323.02.  The Court of Appeals affirmed Shaw's conviction, rejecting Shaw's argument that the trial court improperly precluded his expert witness from testifying about Shaw's mental condition at the time of the alleged offense.  For the reasons that follow, we conclude that, at most, the alleged error was harmless.  Accordingly, we affirm the judgment of the Court of Appeals, albeit for a different reason.

### I.  BACKGROUND

Shaw and his partner, James Fisher, lived together in Arlington, Virginia.  On Tuesday, May 5, 2020, Shaw and Fisher had guests over, including Moika Christopher Nduku (whom Shaw referred to as his nephew) and Jessica Walls.

Fisher died sometime that evening or early the following morning.  His cause of death is unknown.  The Commonwealth's medical examiner was unable to determine whether Fisher died due to blunt force trauma to his face or because of a seizure.  Shaw blamed Nduku for Fisher's death, and repeatedly expressed his belief that Nduku murdered Fisher.  It is undisputed that Fisher's body remained in Shaw's apartment until Friday, May 8, 2020.

Between May 6 and May 8, Shaw planned with Nduku to get rid of Fisher's body and confided in two acquaintances that Fisher's dead body was in his apartment.

Specifically, cellphone records show that Shaw tried to call Nduku five times between 5:00 a.m. and 6:10 a.m. on Wednesday, May 6—the morning that Shaw found Fisher dead in his apartment. Nduku returned Shaw's call at 6:43 a.m. The two continued communicating throughout that morning. Later that day, Nduku texted Shaw, "Hey unk did u get merry maids yet? Or at least start the floors[?]" Shaw responded "No[.]" Shaw called Nduku several times that evening before Nduku went to Shaw's apartment on Thursday morning around 1:30 a.m. Later that morning, Shaw texted Nduku and said that he will feel "better when this situation gets resolved." Shaw also asked Nduku if he "kn[e]w of anyone with a truck that [could] help [him] move [his] furniture[.]" Nduku responded that he did not.

Thursday afternoon around 2 p.m., Shaw texted Nduku "What am I going to do I have to have this furniture moved by today[.]" Nduku told Shaw to "Throw them out if you [can't] move with them[.]" Shaw replied and said he needed "help moving this heavy ass shit[.]" Around 8 p.m., Shaw texted Nduku, saying "we still have to figure out the move[.]" Shortly before midnight, Shaw again texted Nduku and said, "you know I need to see you asap[.]" Nduku responded shortly thereafter saying he would be there soon, and at 12:39 a.m. on Friday, May 8, Nduku texted Shaw and instructed him to "Open the door[.]" Nduku texted Shaw twenty minutes later, stating "Remem[b]er unk keep the ac on[.]" Shaw replied that he "had it on all day[.]" Nduku then told Shaw to keep it on "50 or less[.]"

At 12:25 p.m. on Friday, Shaw inquired if Nduku was "able to complete [his] mission[.]" Nduku responded that he did not and that he needed a license to do so. Right around this time, Shaw called and texted a friend, Denise Barnes, and asked if she "knew anybody with a moving truck, a U-Haul truck." Barnes said she did not.

That same afternoon, Barnes encountered Shaw at the bus stop. Eventually they went to Shaw's apartment. Once inside, Barnes immediately noticed a chair propped up against the bedroom door. Shaw opened the door, and Barnes saw a "pile of clothing and [a] blanket" on the floor. After entering the bedroom, Shaw moved the blanket and clothing, revealing Fisher's dead body. Shaw told Barnes to look around and asked her if he cleaned up well, noting that there was a blood stain near the front door that he could not remove. Shaw asked Barnes not to call the police and to give him until Saturday to bury Fisher's body. He stated that he just needed somebody to help him move Fisher's body into the dumpster beside his apartment. Barnes then left and called the police.

Later that afternoon, Shaw stopped by his friend Linda Allred's apartment. Shaw, having previously told Allred he was in Baltimore for the last three days, informed Allred that he had lied. He then declared that "his nephew had beat[en Fisher] to death and that [Fisher] had been in the house dead for three days." Allred called the police after Shaw left.

Around that same time, Shaw and Nduku were texting each other. Nduku told Shaw to "[g]rab bleach soap and glove[s,]" and Shaw replied that he was "trying to now[.]"

At 4 p.m., the police arrived at Shaw's apartment to perform a welfare check. Shaw was exiting the building as the police approached. Shaw did not allow the officers to enter the building. The police asked if anybody was hurt inside of Shaw's apartment, and Shaw said no. The police asked Shaw about Fisher's whereabouts. Shaw stated that Fisher had a seizure and was receiving care at the hospital. Shaw told the police that he was on the way there. The police testified that Shaw was calm and polite during this encounter. After leaving, the police called the

3

hospital and learned that Fisher had not been admitted. They promptly returned to Shaw's apartment.[1]

Around this time, Shaw texted Barnes and was incredulous that Barnes called the police, saying that "[he] really trusted [her]" and "[a]s soon as [he] told [her] the police showed up[.]" He again reiterated that "[his] nephew did it" and that "[he] didn't[.]"

The police entered Shaw's apartment and found Fisher's body on the floor under a pile of clothing and a blanket. Fisher's body was still clothed but was wrapped in a shower curtain and duct tape. DNA testing revealed that DNA from both Shaw and Nduku was on the duct tape. Trash bags were also placed over Fisher's head. The apartment was so cold that the air-conditioning filter had frosted over.

On Saturday, May 9, Shaw texted his mother and asked for money to rent a hotel room for the night. He stated that he could not call her because his phone was being "traced" by the police. He told her that "my lover . . . was killed in my house" and added that "he [was] killed [T]uesday night and remained in my house for 3 days[.]" He reiterated that he did not murder Fisher, but that he "witness[ed] who did it and in a panic [he] didn't call the police as [he] should have[.]" He explained that he was "most worried" about his probation being revoked because he had "10 years back up time[.]" He said he was "not going . . . to prison for murder" because "[he] didn't do it."

Shaw turned himself in to the police the next day, waived his *Miranda* rights, and gave a videotaped interview. He told the police that he, Nduku, Walls, and others were drinking alcohol and smoking marijuana in his apartment on Tuesday afternoon. Shaw said Fisher was looking at

---

[1] The police received a separate dispatch reporting a dead body at Shaw's apartment, and they were flagged down by Barnes, who also reported that there was a dead body at that location.

a new cellphone in the bedroom while he and the others were in another room. Shaw said he "blacked out" after getting "extremely high." He reported getting up early the next morning to use the restroom and finding Fisher on the living room floor. Shaw stated that he assumed that Fisher had passed out from drinking too much. Shaw then said that Walls awoke him with a phone call after 4:00 a.m. At that point, Shaw stated that he checked on Fisher again and discovered that he was dead. Shaw revealed that Walls arrived at his apartment between 4:00 a.m. and 5:00 a.m. before they both left.

Shaw asserted that he did not return to his apartment until that Friday, and upon returning found that Fisher's body had been moved to the bedroom and his apartment had been cleaned. Shaw then inculpated Nduku, blaming Fisher's death and the subsequent cover-up on him.

When asked why he had not told the police about Fisher's body when he was confronted outside of his apartment, Shaw explained that he did not want the police in his house because he was "scared" and believed he needed "a lawyer present." Also, when pressed on why he had not called the police between Tuesday and Friday, Shaw stated that he did not do so because he "panicked." Shaw explained that he suffered from PTSD, anxiety, and depression.

Shaw was indicted under Code § 18.2-323.02 for concealing a dead body "with malicious intent and to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death." Shaw moved to introduce the expert testimony of Dr. Sara Boyd, who would testify regarding Shaw's mental condition at the time of the offense.

Dr. Boyd's initial report contended that Shaw suffered from various mental illnesses, including major depressive disorder and PTSD. She concluded that, around the time of the offense, Shaw's behavior was "more consistent with a disorganized and highly stressed person with Complex-PTSD, whose limited mental resources were overwhelmed by the shock and pain

5

of finding his partner dead, than it is with planful, intentional, and instrumental concealment to avoid detection of the dead body."

The Commonwealth filed a motion in limine to exclude Dr. Boyd's testimony. At a hearing on the motion, the Commonwealth argued that "[Shaw's] diagnoses do not tend to show that he did not have the requisite intent to commit the offense" charged. The Commonwealth explained that "[n]owhere in Dr. Boyd's report [did] she say he did not have the requisite intent to commit this crime[.]"

At the hearing, Dr. Boyd testified that she met with Shaw for "about five and a half hours" and reviewed his mental health records. Dr. Boyd concluded that Shaw suffered from major depressive disorder and PTSD.

Dr. Boyd identified Shaw's major depressive disorder as "recurrent and severe." She confirmed that PTSD is "a disorder of thought, mood, perception or orientation that significantly impairs judgment or capacity to recognize reality[.]" Dr. Boyd further stated that whether PTSD can "significantly impair judgment and perception" is not debated in her field, but she clarified that "[she did not] know that [she could] say that another expert would not disagree with [her] on" whether Shaw experienced such symptoms during the relevant time period. Nevertheless, Dr. Boyd then stated that "I think it's highly likely that another expert engaged who has a background in this would say that yes, he has [PTSD] and yes, it's significantly affected his functioning in that time."

Dr. Boyd then testified that major depressive disorder "is a severe psychological illness and can result in death" or "psychiatric hospitalization." She confirmed that "Shaw has the type of major depressive disorder that significantly impairs judgment or perception[.]" Dr. Boyd explained how Shaw's major depressive disorder would have impacted his functioning during

6

the relevant time period, ultimately concluding that "[Shaw] would have had significant difficulty taking in information and processing it accurately and he also would have had difficulty thinking about potential consequences of what was happening." Dr. Boyd said that it would have been difficult for Shaw to "have been thinking that far ahead[,]" and that he had "severe difficulty thinking through the potential consequences of his actions if he was able to do that at all." She characterized his "behavior [as] more reactive, more impulsive with very poor judgment[.]"

On cross examination, Dr. Boyd testified that individuals with mental illnesses such as Shaw can experience transient stress-related psychosis, which would be very unlikely to have lasted for the three-day period in which Shaw concealed Fisher's body.[2] Indeed, she testified that

> if it's a longer period of time than just a few seconds, the greater likelihood is that the transient stress related psychosis was not there the entire time, but rather was there sporadically at intervals when the person was under particularly severe stress. Because it's a time limited condition, it wouldn't be likely that it would be present for more than say a few hours.

She went on to note that, although it would not be continuous, the psychosis could recur such that "it could happen for a few hours in the morning and then a few hours in the evening[.]"

---

[2] After referencing a "vagueness" in the period of time in which Shaw allegedly concealed Fisher's body, the Commonwealth asked Dr. Boyd to identify the sources of information she relied on to form the factual basis for her opinions. Dr. Boyd testified that she had reviewed a Washington Post article around the time she decided to review Shaw's case. She then outlined her understanding of the facts for the Commonwealth, omitting details regarding Shaw's numerous interactions with his acquaintances.

After the hearing, Dr. Boyd submitted a letter to the trial court stating that she also gleaned an understanding of the facts from defense counsel and Shaw himself. Dr. Boyd then stated that she has since reviewed the Commonwealth's proffer of facts after the hearing and noted that nothing therein "substantially change[d her] opinion."

Dr. Boyd opined that Shaw's "mood symptoms would have been . . . relatively stable and acute during that time[,]" and Shaw would have also been experiencing hypervigilance, "changes in [his] beliefs and emotions associated with trauma[,]" and "intrusion symptoms[.]" She continued, stating "it's the psychosis piece that I think is more described as transient. The impaired judgment is the part that appears to be more stable[.]" She explained that Shaw's "mood symptoms, hypervigilance and intrusive symptoms" significantly impaired Shaw's judgment, while qualifying that not all of Shaw's intrusion symptoms would have been present throughout the relevant time period.

The Commonwealth then asked Dr. Boyd what she meant when she opined that Shaw likely did not act "intentionally" when he concealed Fisher's body. She responded that she did not believe Shaw "was intending to prevent investigation of the death" and that "in terms of intentional, I'm referring to how sort of organized and how much he was thinking about the future of what would be the outcome of those choices."

When questioned by the Commonwealth on Shaw's interaction with the police outside of his apartment, Dr. Boyd opined that Shaw

> wanted to avoid law enforcement. However, avoiding law enforcement and avoiding contact with law enforcement is in my view different from intending to prevent investigation of a crime. In other words, what I'm saying is in my view it's highly unlikely that he was thinking in that organized a way of I want to conceal this so that law enforcement will not be able to investigate it so that I can avoid some kind of bad outcome. It was more the mind set of I can't deal with this situation. I don't want to talk to the police. I want to try to just make this go away.

The Commonwealth asked Dr. Boyd if her analysis would change if she knew that Shaw had engaged in planning and communications with others about the body at the time of the alleged offense. Her response indicated she was not aware of any such planning or communication with

8

others (or at least the extent of such activities) because she said that whether it would affect her opinions would "depend on" the specifics of the interactions. She noted that such activities would make it more likely that he had acted intentionally during that period and noted that her "expectation [was] that there are times that he could engage in some amount of planning and intentional behavior and other times when he would have been under acute stress and less able to do that and, therefore, that is described as impulsive and reactive."

The trial court sought clarification on whether Dr. Boyd believed Shaw's PTSD impacted his judgment during the time of the alleged offense. Dr. Boyd responded that while Shaw's PTSD was present throughout the relevant time period, "the PTSD severely impairing his judgment" was transient. Dr. Boyd's ultimate opinion was "that the symptoms [she] describe[d] other than transient stress related psychosis[] impaired Mr. Shaw's judgment during the time period that the offense may have occurred[.]"

After the hearing, Shaw submitted to the trial court a declaration from Dr. Boyd further clarifying her opinions. In that declaration, Dr. Boyd reiterated her opinion "that Mr. Shaw has serious mental illness, with symptoms that were active and exacerbated by the stress of finding his partner deceased." "Mr. Shaw's symptoms[,]" she continued, "impaired his ability to process the information about [Fisher's] death in a reality-based way, to reason about his circumstances, and to independently formulate and execute organized planning."

Addressing which mental conditions impacted Shaw's state of mind during the entirety of the three-day period, Dr. Boyd wrote that, in her opinion, "only the transient stress-related psychosis would have been brief and time-limited, with resolution of the psychosis symptoms after a short period of time." She opined that his other mental issues were "chronic and not time-limited" and that these issues "account for his impaired ability to recognize and appreciate his

9

circumstances at the time of the alleged offense." Dr. Boyd contended that Shaw's "behaviors and responses during the roughly three-day period of the alleged offense are best characterized as reactive, impulsive, and instinctive, rather than planful[.]"

The trial court granted the Commonwealth's motion in limine. It determined that Code § 18.2-323.02 contains two intent requirements: (1) "malicious intent" and (2) "the intent to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death[.]" The court then found that Dr. Boyd's testimony was speculative, and therefore inadmissible, because "[she] did not, at any time, specify the intent element under which her opinion would be introduced under Virginia Code § 19.2-271.6." The trial court expounded that "[t]he jury must not be placed in a position where they are guessing which *mens rea* requirement is impacted by Shaw's mental illness."

After a three-day trial, the jury convicted Shaw of concealing a dead body under Code § 18.2-323.02. Shaw appealed to the Court of Appeals, arguing in relevant part that the trial court erred by excluding Dr. Boyd's testimony on Shaw's mental condition.

The Court of Appeals affirmed Shaw's conviction in a published opinion. *Shaw v. Commonwealth*, 79 Va. App. 485 (2024). The Court of Appeals began its analysis by discussing the historical context behind Code § 19.2-271.6, noting that the statute was drafted to overturn *Stamper v. Commonwealth*, 228 Va. 707 (1985), which held that evidence of a defendant's mental condition that fell short of an insanity defense was inadmissible. *Id*. at 512-16. Citing out of state authorities to buttress its interpretation of the statute, the Court of Appeals stated that an expert must tie the defendant's mental condition to the requisite mens rea. *Id*. at 516-20. Specifically, the Court of Appeals held that "to be helpful to the fact finder, . . . [t]he [expert's]

10

diagnosis must be capable of forensic application[.]" *Id*. at 520 (internal quotation marks and alterations omitted).

After setting forth this legal background, the Court of Appeals held that the trial court did not abuse its discretion because Dr. Boyd did not provide "an explanation connecting Shaw's mental condition to *how* it negated the state of mind required to violate Code § 18.2-323.02." *Id*. at 522 (emphasis in original). The Court of Appeals rhetorically questioned how Dr. Boyd's testimony showed (1) that Shaw's false statements to law enforcement officers were not knowing falsehoods, and (2) "how . . . Shaw [did] *not* intend that deception to prevent the detection of the death or the manner or cause of death[.]" *Id*. at 522-23 (emphasis in original) (internal quotation marks omitted). As a result, the Court of Appeals concluded that "[t]he trial court properly excluded Dr. Boyd's testimony." *Id*. at 520-25.

Shaw now appeals.

## II. ANALYSIS

### A. Code § 18.2-323.02

Shaw was charged with and convicted of violating Code § 18.2-323.02. That statute provides that "[a]ny person who transports, secretes, conceals or alters a dead body, as defined in § 32.1-249, with malicious intent and to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death is guilty of a Class 6 felony."[3] We have "long defined malice as 'the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'" *Watson-Scott v. Commonwealth*, 298 Va. 251, 255-56 (2019) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)). Thus, under its theory of the case,

---

[3] Code § 32.1-249 defines a "'[d]ead body'" as "a human body or such parts of such human body from the condition of which it reasonably may be concluded that death occurred."

the Commonwealth was required to prove that (1) Shaw concealed or secreted Fisher's body (2) to prevent the detection of (a) an unlawful act or (b) the cause of Fisher's death and (3) that he did so (a) out of ill will, (b) without just cause or excuse, or (c) intentionally with an appreciation that his act was wrongful.

The statute does not specify from whom the dead body must be secreted or concealed. Accordingly, the Commonwealth was not required to prove that Shaw concealed or secreted Fisher's body to prevent detection by law enforcement specifically. Although it will often be the case that a person violating the statute will be secreting or concealing the body from law enforcement, a violation of the statute can occur even if the person concealing the body has no contact with law enforcement.

As a result, Code § 18.2-323.02 is violated once a person conceals a dead body with the necessary intent and does not require that the person possess that intent for the entirety of the time the body is concealed. Here, the evidence clearly establishes that Shaw concealed Fisher's dead body over a period of days. The only issue is whether he did so with the necessary intent. If he possessed the necessary intent at any point after his discovery of Fisher's body and its discovery by police three days later, he committed the crime even if he lacked the necessary intent at other points over the multi-day period.

Shaw's main contention on appeal is that Code § 19.2-271.6 entitled him to offer evidence of how his mental condition prevented him from having the necessary intent and that the lower courts erred in concluding that the statute did not permit him to call Dr. Boyd as a witness.

12

B.  Code § 19.2-271.6 and the rulings below

In 2021, the General Assembly enacted Code § 19.2-271.6, which provides, in pertinent part, that

> [i]n any criminal case, evidence offered by the defendant concerning the defendant's mental condition at the time of the alleged offense, including expert testimony, is relevant, is not evidence concerning an ultimate issue of fact, and shall be admitted if such evidence (i) tends to show the defendant did not have the intent required for the offense charged and (ii) is otherwise admissible pursuant to the general rules of evidence. For purposes of this section, to establish the underlying mental condition the defendant must show that his condition existed at the time of the offense and that the condition satisfies the diagnostic criteria for (i) a mental illness, (ii) a developmental disability or intellectual disability, or (iii) autism spectrum disorder as defined in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association.

Code § 19.2-271.6(B).

In effect, the statute overrules the rule of *Stamper*, 228 Va. at 717, that "[f]or the purposes of determining criminal responsibility a perpetrator is either legally insane or sane[,]" and therefore, "[u]nless an accused contends that he was [insane] when he acted, his mental state is immaterial to the issue of specific intent."

Although it does alter the rule of *Stamper*, Code § 19.2-271.6 does not render all evidence related to a defendant's mental condition admissible. Rather, such evidence must (1) demonstrate that the defendant, at the time of the offense, suffered from an "underlying mental condition" as defined in the statute, (2) "tend[] to show the defendant did not have the intent required for the offense charged[,]" and (3) be "*otherwise admissible pursuant to the general rules of evidence.*" Code § 19.2-271.6(B) (emphasis added).

Performing its gatekeeping function regarding expert testimony and applying the general rules of evidence, the trial court found that Dr. Boyd's opinions regarding Shaw's mental

13

condition were inadmissible.  In what Shaw characterizes as "reaching a conclusion the trial court itself never reached[,]" the Court of Appeals engaged in a lengthy explication of the requirements of Code § 19.2-271.6, including how other jurisdictions apply similar provisions, and determined that Dr. Boyd's opinions did not satisfy the statute's requirements.  From this determination, the Court of Appeals concluded that "[t]he trial court properly excluded Dr. Boyd's testimony."  *See Shaw*, 79 Va. App. at 520.

On appeal to this Court, Shaw contends that the trial court and the Court of Appeals used distinct rationales to find that Dr. Boyd's proffered opinions were inadmissible and that each erred in its conclusion.  He argues that Dr. Boyd's opinions were admissible under the new rule set forth in Code § 19.2-271.6(B).  Although the questions of whether the trial court and the Court of Appeals utilized different rationales, whether Dr. Boyd's opinions properly could be excluded under the general rules of evidence, and whether her proffer was sufficient to satisfy all of the requirements of Code § 19.2-271.6(B) are all interesting, we need not, and therefore do not, answer those questions in resolving this appeal.  *See Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (holding that "[t]he doctrine of judicial restraint dictates that we decide cases on the best and narrowest grounds available" (internal quotation marks and citations omitted)).  "In this case, the best and narrowest ground is our conclusion that the alleged trial court error, if error at all, was harmless as a matter of law."  *Commonwealth v. White*, 293 Va. 411, 419 (2017).

C.  Harmless error

"The harmless-error concept is no mere prudential, judge-made doctrine of appellate review[,]" but rather, represents "a legislative mandate . . . [that] limits the adjudicatory power of Virginia appellate courts."  *Id.*  Specifically, Code § 8.01-678 provides that

> [w]hen it plainly appears from the record and the evidence given at
> the trial that the parties have had a fair trial on the merits and

14

> substantial justice has been reached, no judgment shall be arrested
> or reversed . . . [f]or any . . . defect, imperfection, or omission in
> the record, or for any error committed on the trial.

Given this statutory limitation on our authority, "it is not enough for an appellant to demonstrate that a trial court [may have] erred; to be entitled to relief, he must demonstrate that [any alleged] error was significant enough to merit reversal." *Welsh v. Commonwealth*, Record No. 230800, slip op. at 19, 304 Va. ___, ___, ___ S.E.2d ___, ___ (March 20, 2025).

The error alleged by Shaw, that the trial court erred in an evidentiary ruling, does not implicate a Constitutional issue, and therefore, we review the matter under the non-constitutional harmless error standard. *Id*. at 20, 304 Va. at ___, ___ S.E.2d at ___. A non-constitutional error is deemed harmless when we "can conclude that the error did not influence the jury or had but slight effect." *Commonwealth v. Kilpatrick*, 301 Va. 214, 216 (2022) (internal quotation marks and alterations omitted). "To reach this conclusion, the evidence of guilt must be so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the" outcome. *Id.* at 217 (*citing Haas v. Commonwealth*, 299 Va. 465, 467 (2021)). In a criminal case, we must be able to conclude that if the error had not occurred, the jury still would have convicted the defendant. *Kotteakos v. United States*, 328 U.S. 750, 764 (1946).

This task requires us to engage in what we recently described as "hypothetical 'fact' finding[.]" *Welsh,* slip op. at 21, 304 Va. at ___, ___ S.E.2d at ___. We do not ask whether the evidence absent the error was sufficient for conviction, whether the members of this Court would have convicted absent the error, or even whether the defendant clearly is guilty in fact; rather we are tasked with determining whether the jury still would have convicted absent the error. *Id*. at 21-22, 304 Va. at ___, ___ S.E.2d at ___.

15

Because the alleged error here was the exclusion of Dr. Boyd's testimony, our review requires us to hypothesize about what the outcome would have been if she had testified. Accordingly, we consider both her testimonial proffer and any declarations she submitted that the trial court considered in making its determination regarding admissibility. In doing so, we do not only consider the portions of the proffer that are favorable to Shaw; rather, we consider the totality of the proffer, including any limitations on her opinions that arose from examination by the Commonwealth or the trial court, any apparent inconsistencies in her testimony, and any other factors that might affect her credibility before the jury.

We recently recognized that improperly excluding a defendant's expert regarding a central part of the defense can represent a significant error because "it is not a stretch to believe that scientific evidence is given great weight by jurors." *Id*. at 23, 304 Va. at ___, ___ S.E.2d at ___. We also noted, however, that such a circumstance "does not inexorably lead to the conclusion that the error was not harmless" because "[e]ven a substantial trial court error in excluding evidence may be deemed harmless if the 'evidence of guilt [is] so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the'" outcome. *Id*. at 25-26, 304 Va. at ___, ___ S.E.2d at ___ (quoting *Kilpatrick*, 301 Va. at 217).

To determine whether the alleged error was harmless, we must place Dr. Boyd's proffered testimony into the context of the trial. This requires a review of the elements of the offense, the potential effect of Dr. Boyd's opinions regarding those elements, and how those opinions fit with all of the other evidence in the case. In short, "we consider the potential effect of the excluded evidence in light of all the evidence that was presented to the jury." *Commonwealth v. Proffitt*, 292 Va. 626, 642 (2016) (quoting *Barkley v. Wallace*, 267 Va. 369, 374 (2004)).

16

For the reasons that follow, such a review leads us to the conclusion that "the evidence of guilt [is] so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the verdict." *Kilpatrick*, 301 Va. at 217. Accordingly, the error alleged by Shaw, if it be error at all, constitutes harmless error in this case.

D. Dr. Boyd's proffered opinions and the evidence at trial

In the declaration she submitted after the hearing regarding her testimony, Dr. Boyd purports to hold the unequivocal opinion that Shaw's various mental health problems, whether transient or more permanent, deprived him of the ability to plan to conceal Fisher's body or to intend to do so "with malicious intent and to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death[.]" *See* Code § 18.2-323.02. Shaw contends that, if the jury had heard these opinions from Dr. Boyd, it may have concluded that he lacked the necessary intent to commit the crime.

If we viewed Dr. Boyd's final declaration in a vacuum, it might support Shaw's claim that he suffered harm as a result of the trial court's exclusion of Dr. Boyd's testimony. Harmless error analysis, however, does not permit us to view the final declaration in a vacuum. Rather, we must view it in conjunction with all of the other evidence, including Dr. Boyd's testimony at the hearing and the evidence of Shaw's actions and statements. *See Proffitt*, 292 Va. at 642.

Unlike the unequivocal opinion stated in the declaration, Dr. Boyd's testimony at the hearing reveals a less certain picture. Although her ultimate conclusion seems the same, a look beyond that conclusion to the constituent parts of Dr. Boyd's thought processes reveals opinions that are far more equivocal than those expressed in her declaration.

For example, fairly read, the main thrust of Dr. Boyd's hearing testimony was that Shaw's major depression, which was constant, combined with the transient psychosis associated

17

with his PTSD, which was not constant, to deprive him of the ability to plan and form the necessary intent.[4]  During the hearing, she indicated that her opinion was that the transient psychosis would not have been present for the entire three-day period during which Shaw concealed Fisher's body.  Specifically, she said "the greater likelihood is that the transient stress related psychosis was not there the entire time, but rather was there sporadically at intervals" and that it was not likely that the stress related psychosis "would be present for more than say a few hours" as opposed to being present for the entire three-day period.  Under further questioning by the Commonwealth, she again opined that her opinions did not mean that Shaw lacked the ability to plan or form intent during the entire three-day period because it was her "expectation . . . that there [we]re times that he could engage in some amount of planning and intentional behavior and other times when he would have been under acute stress and less able to do that and, therefore, that is described as impulsive and reactive."

These qualifications of her opinions were no mere slips of the tongue, but were a central part of the trial court's decision-making process at the time.  So central were these limitations on her opinion to the trial court's decision-making process that the trial court, at the end of the Commonwealth's cross-examination, asked Dr. Boyd to confirm that it properly understood her opinions.  Specifically, the trial court asked her "for clarification that the PTSD severely

_____

[4] At the hearing, the trial court specifically asked Dr. Boyd "Did you testify that the depression alone would not have impaired his judgment, but in combination with the PTSD it would have?"  Dr. Boyd responded it was the combination of the transient psychosis associated with Shaw's PTSD and his major depression that led to her conclusion, stating that it was "not likely that if he only had depression that he would have had a degree of impairment that was severe enough that I would offer the opinion that it would severely impair his judgment unless he was at that . . . catatonic or not able to talk kind of level of depression."  There was no evidence that Shaw was either catatonic or unable to talk during the relevant three-day period.

18

impairing his judgment[] . . . was transient" to which Dr. Boyd unequivocally responded "Yes, yes."

Thus, even assuming Dr. Boyd would have testified on direct examination at trial consistent with her unequivocal declaration, that absolute opinion would have been undermined by the more equivocal opinions she gave during her sworn testimony at the hearing. *See* Rule 2:607(a)(vi) (permitting impeachment of a witness by prior inconsistent statement). Regardless of whether or not her ultimate trial testimony adopted the qualifications she conceded during her testimony at the hearing, the existence of her prior statements would have, at a minimum, caused reasonable jurors to doubt that Shaw was unable to plan or form intent for the entirety of the three-day period.[5]

In addition to these inconsistencies in Dr. Boyd's opinions, the manner in which she came to her final conclusions likely would have caused reasonable jurors to doubt her ultimate conclusion. From her hearing testimony, it is apparent that she reached her initial conclusions without being familiar with critical facts about the case. Specifically, when asked if knowing that Shaw had engaged in planning or communication with others during the three-day period could affect her conclusions, she acknowledged that it could and that it would "depend on" the specifics of the interactions. That Dr. Boyd conceded that she came to her conclusions without

---

[5] Again, this is critical because, as noted above, Shaw did not have to possess the necessary intent for the entirety of the three-day period in which he concealed the body. If, at any point while he was concealing the body, he could and did form the requisite malicious intent, he was guilty of violating Code § 18.2-323.02. Accordingly, Dr. Boyd's hearing testimony that he likely was capable of planning and intentional actions at points during the three-day period is extremely significant.

19

first knowing relevant and important information that had the potential to alter those conclusions provides yet another reason for reasonable jurors to discount her ultimate conclusions.[6]

If these inconsistencies and other issues with Dr. Boyd's opinions were the only basis for concluding that the exclusion of her testimony, if error at all, was harmless, we might not be able to reach that conclusion. However, the remainder of the evidence combines to make such a conclusion a virtual certainty.

From the moment Shaw discovered Fisher's body, his activities and statements leave almost no room for a reasonable juror to conclude anything other than that Shaw planned and maliciously intended to conceal the body "to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death." Code § 18.2-323.02.

After discovering Fisher's body, Shaw, either alone or in conjunction with Nduku,[7] went about wrapping it in a shower curtain, trash bags, and duct tape. To further conceal the body, he covered it with clothes and a blanket. Additionally, Shaw acquired cleaning products, including bleach, and cleaned the area around the body and attempted to remove any blood stains (including from the body itself), necessarily altering/concealing evidence related both to the cause of death and a potential crime.

Evidence from Shaw himself demonstrated that he was aware of what he was doing and that it was wrongful, i.e., that he operated with malicious intent. After his discovery of the body,

---

[6] The fact that, in her post-hearing declaration, Dr. Boyd indicated she was eventually provided with the Commonwealth's written proffer detailing some of these facts, that it largely comported with her initial understanding of the facts, and nothing about that information altered her conclusions regarding Shaw's alleged inability to plan or form intent does not change the fact that reasonable jurors could discount her opinion based on her apparent lack of knowledge of Shaw's activities with others during the initial hearing.

[7] DNA from both Shaw and Nduku was found on the duct taped used to wrap Fisher's body.

20

Shaw engaged in a lengthy text exchange with Nduku that addressed the need to clean the area where Fisher had died, the need to obtain a truck so that the body could be moved, and the need to permanently dispose of the body. They also discussed that Shaw needed to and had in fact turned the air conditioning down to a temperature in the low 50s. It stretches credulity beyond the breaking point to even suggest that these actions and conversations were not undertaken intentionally for the purpose of concealing the body and preventing discovery both of the body and the circumstances surrounding Fisher's death, including its cause. Furthermore, the pair's thinly veiled, coded exchange, referencing Fisher's body as "furniture," demonstrates that each perceived their intentional actions as wrongful, i.e. malicious. *See Watson-Scott*, 298 Va. at 255-56 (recognizing that malice inheres in the intentional performance of a wrongful act). If the actions were not understood as wrongful, the coded references would have been unnecessary.

In addition to his exchanges with Nduku, Shaw's communications with Barnes further demonstrated that his actions were intentional and that he knew they were wrongful. When he first contacted Barnes, by text on May 8, Shaw still was seeking a truck to move the body. Later that afternoon, he ran into Barnes, brought her to his apartment, and showed her what he had hidden in his bedroom—Fisher's body. Any question that he was fully aware of what he was doing and knew that it was wrongful is put to rest by his comments to Barnes regarding the good job he had done cleaning up and his request that she not call the police. This conclusion is further supported by Shaw's subsequent texts to Barnes in which he was incredulous that she had called the police and indicated that her doing so amounted to a breach of trust.[8]

---

[8] That Shaw was fully aware that he was hiding a body and that he was intentionally engaged in wrongful conduct is further borne out by his conversation with Allred. He unequivocally told Allred that Nduku had killed Fisher and that the body had remained in Shaw's apartment for three days.

Finally, and perhaps most damning, were Shaw's text messages to his mother on May 9. They reflect both that Shaw was fully aware of the circumstances and that he knew his actions were wrongful. In the text chain, Shaw made repeated references to the "murder" of Fisher and that the body remained concealed in his house for three days before the police had discovered it. He acknowledged that he "should have" called the police immediately, demonstrating that he understood his actions were wrongful. Furthermore, he gave specific reasons for his failure to contact the police that had nothing to do with his mental state. Shaw made clear that he was attempting to avoid going to prison and that he was "most worried about [his] probation" for a prior offense because he had "10 years back up time" that could be imposed. The messages made clear that his goal was and had been to avoid going to prison, demonstrating that his actions were intentional and that he knew his actions were wrongful.[9]

Taken together, all of this evidence, which was credited by the jury, leads to but one conclusion—Shaw violated Code § 18.2-323.02. Harmless error review requires us to consider whether a reasonable jury would have reached a different conclusion regarding this evidence if Dr. Boyd had been permitted to testify. Given the inconsistencies and other issues with Dr. Boyd's opinions, we have no doubt that her testimony would not have led to a different outcome.

---

[9] We note that Shaw lying to police about Fisher when the police first came to his apartment provides further evidentiary support for the notion that Shaw was intentionally concealing Fisher's body "with malicious intent and to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death[.]" Code § 18.2-323.02. Dr. Boyd, however, opined specifically that, in her view, his lies to the police were told "to avoid law enforcement" and represented an attempt "to try to just make this go away." Although Shaw said he lied to the police because he did not want to discuss the matter with them absent a lawyer, if the jury believed Dr. Boyd about the conversation that might suggest a lack of intent at that one precise moment in time. Because the other evidence is such that reasonable jurors necessarily would have concluded that Shaw had the necessary criminal intent at other points, our conclusion regarding harmless error does not rest on Shaw's initial interaction with the police.

The evidence largely refutes Dr. Boyd's central premise that Shaw was unable to plan or form intent over the three-day period. This refutation stems not just from Shaw's actions, which reveal his planning to conceal the body and his doing so, but also from his words. To credit Dr. Boyd's view, the jury would have had to disbelieve Shaw's own statements at the time, many of which cannot be disputed because they come from his own texts. Simply put, a review of all of the evidence causes us to conclude that the exclusion of Dr. Boyd's testimony "did not influence the jury" because "the evidence of guilt [is] so overwhelming that it renders the [alleged] error insignificant by comparison such that the [alleged] error could not have affected the" outcome. *Kilpatrick*, 301 Va. at 216-17. Accordingly, we find that, to the extent that the exclusion of Dr. Boyd's testimony can be considered error, it was, at most, harmless error.[10]

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Court of Appeals, albeit for a different reason.

*Affirmed*.

---

[10] In doing so, we reiterate our observation from *Welsh* that "our conclusion necessarily is tied to the specific facts of this case" because "harmless error review requires 'case-specific application of judgment.'" *Welsh*, slip op. at 27, 304 Va. at ___, ___ S.E.2d at ___ (quoting *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009)).