COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Frank and Senior Judge Hodges
Argued at Richmond, Virginia


DOUGLAS OLGERS
                                    MEMORANDUM OPINION[*] BY
v.    Record No. 1776-98-2          JUDGE WILLIAM H. HODGES
                                       NOVEMBER 23, 1999
COMMONWEALTH OF VIRGINIA


             FROM THE CIRCUIT COURT OF DINWIDDIE COUNTY
                     Thomas V. Warren, Judge

        David B. Hargett (Joseph D. Morrissey;
        Morrissey, Hershner & Jacobs, on brief), for
        appellant.

        Marla Graff Decker, Assistant Attorney
        General (Mark L. Earley, Attorney General, on
        brief), for appellee.


     Douglas Olgers (appellant) appeals his jury trial

convictions for four counts of possession of a firearm by a

convicted felon, seven counts of spotlighting deer, and three

counts of unlawfully selling deer meat pursuant to Code

§§ 18.2-308.2, 29.1-523[1] and 29.1-553 respectively.  On appeal,

_____

     * Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

     [1] Code § 29.1-523 provides as follows:

             Any person who kills or attempts to
        kill any deer between a half hour after
        sunset and a half hour before sunrise by use
        of a light attached to any vehicle or a
        spotlight or flashlight shall be guilty of a
        Class 2 misdemeanor.  The flashing of a
        light attached to any vehicle or a spotlight

he contends the trial court erred in refusing to instruct the jury on the defense of entrapment.  For the reasons that follow, we agree and reverse his convictions.

## FACTS

The Commonwealth's evidence consisted solely of the testimony of Mike Campbell, a Special Agent for the Virginia Department of Game and Inland Fisheries.  He testified that in the fall of 1997 he was assigned to conduct an undercover investigation of "the hunting activities" of appellant and his associates.  Campbell testified appellant was his "number one" target.  Campbell "went in posing as a hunter" and paid appellant $50 to join his hunting group.  Campbell's

_____

> or flashlight from any vehicle between a half hour after sunset and half hour before sunrise by any person or persons, then in possession of a rifle, shotgun, [or] pistol, . . . without good cause, shall raise a presumption of an attempt to kill deer in violation of this section.  Every person in or on any such vehicle shall be deemed a principal in the second degree and subject to the same punishment as a principal in the first degree.  Every person who, in any manner, aids, abets or acts in concert with any person or persons violating this section shall be deemed a principal in the second degree and subject to the same punishment as a principal in the first degree.

Code § 29.1-553 provides as follows:

> A.  Any person who offers for sale, sells, offers to purchase, or purchases any wild bird or wild animal, or any part thereof, . . . except as provided by law, shall be guilty of a Class 1 misdemeanor.

-

investigation continued from late September 1997 until January 1998. Campbell testified when he initiated contact with appellant, he did not know that appellant had a reputation as an alcoholic and did not know that appellant was a convicted felon.

Campbell initially told appellant he was in the wholesale seafood business, which he said was slow during the winter. Appellant, who was unemployed, asked Campbell to give him a job, but Campbell stated that he never offered appellant a job.

Campbell testified that on November 17, 1997, he met appellant at appellant's residence at 5:30 a.m., before sunrise, and at appellant's request. Appellant asked if Campbell's shotgun was in the truck. Campbell said he had both his shotgun and his rifle, and appellant responded, "[G]ood let's go." When they entered Campbell's vehicle, Campbell told appellant the shotgun was not loaded. Appellant asked for the shells and loaded the gun. Appellant then "directed [Campbell] to drive to numerous locations around the . . . area in an attempt to locate deer." At 5:52 a.m., appellant spotted some deer on the side of the road, and he "directed [Campbell] to stop [his] truck and keep the headlights on the deer." Appellant fired Campbell's shotgun at the deer but he missed the deer.

Campbell testified that on the afternoon of December 9, 1997, appellant asked Campbell if he wanted "to ride the fields," and appellant directed Campbell to a field where another hunter spotted a deer. Appellant obtained Campbell's

-

rifle from the back seat, told Campbell to stop the truck, and he shot the deer from the window of Campbell's truck.

Campbell testified that on December 18, 1997, he and appellant hunted together in Brunswick County, and appellant took home a deer. The men returned to appellant's residence, where appellant skinned and cut up the deer. Campbell "arranged for the purchase of that deer" from appellant, for which appellant set a price of $50. Campbell paid appellant the $50 and picked up the deer later that night. At some point in their encounters, Campbell told appellant that "[h]e had a good market up north for deer meat."

Campbell testified that on December 26, 1997, he went to appellant's residence. Appellant told Campbell that he and his fellow hunters had killed four deer that day, and he asked if Campbell wanted to buy some deer meat. When Campbell said yes, appellant then asked another hunter if he wanted to sell Campbell some deer meat. Campbell and the other hunter negotiated a price, and appellant placed the meat into Campbell's cooler. Appellant then asked Campbell if he wanted to buy a deer tenderloin from appellant for $5. Campbell said that he did and paid appellant for the meat.

Campbell testified that on January 1, 1998, he went to appellant's residence, where another hunter appeared and began to cut up a deer. Appellant arrived, had a conversation with the hunter and then approached Campbell. Appellant and the

-

hunter finished cutting up the deer and put it in Campbell's cooler. Campbell paid the other hunter $50 for the deer.

Campbell testified that on the afternoon of January 2, 1998, while he and appellant were driving to a particular location to hunt, appellant spotted several deer by the side of the road. Appellant grabbed Campbell's shotgun, which Campbell earlier had loaded, and appellant killed one of the deer. Campbell purchased this deer meat from appellant.

In the late afternoon of January 7, 1998, Campbell went to appellant's house, and appellant asked him "to go riding." Appellant directed Campbell to drive around, and they looked for deer. Appellant was drinking and was "pretty drunk that night." At appellant's request, Campbell bought appellant a six-pack of beer at two different times that night.

At 6:11 p.m., after sunset, they spotted two deer, and appellant directed Campbell to stop the vehicle and keep his headlights on the deer. Appellant retrieved Campbell's rifle and fired at the deer, but the rifle was not loaded. As they continued to drive around, appellant repeatedly "instruct[ed] [Campbell] how to manipulate [his] truck" in order to use his headlights to search for more deer. At 6:20 p.m., they saw more deer, and appellant again instructed Campbell to keep his headlights on the deer, but the deer ran away before appellant could fire.

-

At 7:49 p.m., appellant instructed Campbell to drive to the residence of an acquaintance, where appellant obtained a spotlight and some unknown pills, which appellant took. Appellant then told Campbell to drive to another area, and on the way, he shined the spotlight at two different groups of deer, at 8:18 and 8:23 p.m. Appellant pointed Campbell's gun at each group, but the deer ran away before he could fire.

On three additional occasions that night--at 8:30 p.m., just a minute or two after that, and again at 8:41 p.m.-- appellant saw more deer and directed Campbell to shine his headlights on them. On the first two of these occasions, appellant shot and missed, and on the third occasion, the deer ran away before he was able to fire.

Campbell testified that he bought alcohol for appellant on four occasions: he bought appellant a six-pack of beer when they first met in September 1997; on another occasion, at appellant's request, he gave appellant a dollar to buy alcohol; and on January 7, 1998, he bought appellant two six-packs, each of which was purchased at a different time. Of the time that Campbell spent hunting with appellant, he could not remember a day that appellant did not drink alcohol. Although Campbell recalled buying alcohol for appellant on only those occasions listed above, Campbell testified that appellant regularly asked Campbell to stop so that appellant could buy beer. On several

-

of the days appellant drank, Campbell also saw appellant smoke marijuana.

Appellant's evidence contradicted Campbell's testimony in significant, material matters. Appellant testified that when he met Campbell, Campbell said he was a wholesale seafood distributor and, with knowledge that appellant was unemployed, Campbell offered appellant a job catching baby eels after hunting season that would pay $30,000 for three months of work. Appellant also testified that Campbell initially brought up the subject of selling deer meat, asking appellant when they first met "if [he] had ever sold any meat." Appellant said he had sold "coon meat," and when Campbell inquired about deer, appellant said he had never sold deer meat. Campbell told appellant, "You don't know what you are missing. . . . [Y]ou ought to carry it up north" where people are "crazy" about it. Campbell told appellant that Campbell could sell the deer for $100 per deer and that he would pay appellant $50 per deer.

Appellant testified he does not own any guns or a vehicle. Appellant said Campbell kept a loaded rifle in his truck, and appellant denied having to load the gun before using it. Appellant did not provide any ammunition during the incidents.

Appellant testified that Campbell joined his hunt club by paying $50. All members either paid $50 or permitted the club to hunt on their land or to use their dogs for hunting.

-

Appellant stated that he usually drove the dogs and carried a stick to flush the deer during hunts.

Appellant admitted that he probably committed the offenses with which he was charged. However, he denied actually killing or even seeing any deer at night while hunting with Campbell. Appellant testified, "[Campbell] came to my house and got me, he put this idea in my head." Appellant admitted trying to use the spotlight until it "went dead" but, again, said that it was Campbell's idea.

Appellant also offered evidence that Campbell supplied him with "beer, liquor and drugs" every time they hunted. He stated that Campbell gave him marijuana on several occasions. Appellant said he did not drink on the days that Campbell did not hunt with him.

Appellant testified that he had been drinking alcohol for eight years and that, when riding with Campbell, appellant would drink "[a]s much as [he] possibly could." Appellant stated that when Campbell gave appellant the marijuana, Campbell said, "You can smoke it now or you can save it for later on this evening." Campbell then asked, "We are going to ride around this evening later, ain't we?" Appellant said, "Yes, I guess, you know if you want to."

Appellant testified Campbell sometimes arrived at appellant's residence with beer in his cooler but Campbell usually gave appellant the money with which to purchase beer.

-

Campbell often stopped to allow appellant to buy beer while they were riding around in Campbell's truck. Appellant testified that Campbell "kept [him] drunk constantly" and that appellant was "stoned, high, drunk, [and] didn't even know what [he] was doing half the time [he] was with [Campbell]." Appellant stated that Campbell "kept him in a dream, [he] was so high." Appellant testified that if he committed the offenses with which he was charged he did so because Campbell "kept [him] drunk and high."

Other witnesses corroborated that appellant drank frequently while hunting with Campbell, and they confirmed that Campbell supplied appellant with at least some of the alcohol he drank while hunting, including twelve-packs of beer. One witness stated appellant was "sometimes" unable to drive the dogs later in the day when he had consumed too much alcohol. Another witness also testified that Campbell told appellant, "the more [deer] you kill the more [deer meat] I am going to buy."

At trial, appellant offered the following jury instruction:

> Entrapment is the origination and planning of an offense by an officer of the law and his procurement of its commission by one who would not have committed it except for the trickery, persuasion or fraud of an officer. Where a person intends to and does commit the crime, the fact that officers of the law provided a favorable opportunity for, aided or encourage[d] the commission of the offense is not entrapment. If you believe:

-

(1) That the defendant had no previous
intent or purpose to commit the crime;
and

(2) That an officer of the law,
directly or through his agents,
originated in the mind of the defendant
the idea to commit the crime; and

(3) That an officer of the law,
directly or through his agents, caused
the defendant to commit the crime by
trickery, persuasion or fraud[,]

then you shall find the defendant not
[guilty] even though you may believe from
the evidence that he consented to the
commission of the crime.

Appellant contended that his evidence provided a sufficient factual basis for the instruction. The trial court refused the instruction, holding that appellant's evidence, "even if believed, . . . does not rise to a level of entrapment [because] the officer merely provided a favorable opportunity for the offense to have been committed."

ANALYSIS

On appeal of the denial of a jury instruction, "we view the evidence with respect to the refused instruction in the light most favorable to [appellant]." Boone v. Commonwealth, 14 Va. App. 130, 131, 415 S.E.2d 250, 251 (1992). In Neighbors v. Commonwealth, 214 Va. 18, 19, 197 S.E.2d 207, 208 (1973), the Court stated that in reviewing a refused entrapment instruction, the Court views the evidence "in the light most favorable to the theory of entrapment." "If any credible evidence in the record

-

supports a proffered [jury] instruction . . . , failure to give the instruction is reversible error."  Boone, 14 Va. App. at 132, 415 S.E.2d at 251.  However, that credible evidence must amount to "more than a mere scintilla."  Id.

"'Entrapment is the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer.'"  Stamper v. Commonwealth, 228 Va. 707, 715, 324 S.E.2d 682, 687 (1985) (quoting Falden v. Commonwealth, 167 Va. 549, 555-56, 189 S.E. 329, 332 (1937)). "Entrapment occurs when the defendant's criminal conduct was the product of '"creative activity" [by the police] that implants in the mind of an otherwise innocent person the disposition to commit an offense and induce its commission in order to prosecute.'"  McCoy v. Commonwealth, 9 Va. App. 227, 231, 385 S.E.2d 628, 630 (1989) (quoting Stamper, 228 Va. at 715, 324 S.E.2d at 687).  "If there be conflict in the evidence as to whether the criminal intent originated in the mind of the accused or was induced or incited by the officer, then the solution of the question should be submitted to the jury." Falden, 167 Va. at 556, 189 S.E. at 332.

"[W]hen a principle of law is vital to a defendant in a criminal case, a trial court has an affirmative duty properly to instruct a jury about the matter."  Jimenez v. Commonwealth, 241 Va. 244, 250, 402 S.E.2d 678, 681 (1991).

-

The conflicting facts and circumstances present sufficient evidence upon which the question of entrapment should have been submitted to the jury. Appellant presented evidence that Campbell repeatedly furnished him with alcohol and drugs, keeping appellant "stoned, high, drunk [so that appellant] didn't even know what [he] was doing half the time." Appellant testified that Campbell "kept [him] in a dream, [he] was so high." Furthermore, appellant testified that when he first met Campbell, Campbell raised the issue of selling deer meat, and Campbell told appellant he ought to sell the meat "up north" or that Campbell would buy deer meat from appellant for resale "up north." Appellant stated that on January 7, 1998, it was Campbell's idea to spotlight deer and that Campbell came to appellant's house "and got [him]" to take him riding that evening. Appellant testified that Campbell always carried a loaded gun in his truck, and appellant never provided guns or ammunition for his hunting with Campbell. Moreover, appellant, who was unemployed during the incidents, stated that Campbell offered him a job.

Thus, appellant's theory is that Campbell targeted appellant, then plied him with drugs and alcohol and initiated the scheme by persuasion, fraud or trickery, implanting in appellant's impaired mind the disposition or intent to commit the crimes. Campbell then encouraged appellant to sell deer meat, offering appellant money and employment, providing the

-

vehicle, weapons, ammunition, and instructing appellant on how to sell the meat. We cannot say that appellant's evidence is inherently incredible or not worthy of belief as a matter of law. Appellant's evidence created a question of fact, which the fact finder should have been allowed to resolve after being instructed on the law of entrapment. See <u>McCoy</u>, 9 Va. App. at 231, 385 S.E.2d at 630.

Accordingly, we hold that the trial court erred in failing to instruct the jury on the defense of entrapment. Therefore, we reverse the convictions and remand the case to the trial court for such further action as the Commonwealth may be advised.

<u>Reversed and remanded</u>.