# COURT OF APPEALS OF VIRGINIA

**Record No. 0135-25-2**

CALVIN DELONTA WATSON
v.
COMMONWEALTH OF VIRGINIA

Present: Judges Beales, O'Brien and Ortiz

Opinion Issued May 26, 2026[*]

## FROM THE CIRCUIT COURT OF HENRICO COUNTY
John Marshall, Judge

(William J. Viverette, on brief), for appellant. Appellant submitting on brief.

(Jason S. Miyares,[1] Attorney General; C. David Sands, III, Senior Assistant Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## JUDGE MARY GRACE O'BRIEN

Following a jury trial, the circuit court convicted Calvin Delonta Watson of two counts of sex trafficking with the intent to receive money and four counts of using a communications system to solicit a minor. The court sentenced him to 80 years of incarceration with 66 years suspended. On appeal, Watson challenges the court's refusal to give the jury his proffered entrapment instruction. For the following reasons, we affirm.[2]

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument." Code § 17.1-403(ii)(c); Rule 5A:27(c). In addition, Watson waived oral argument.

BACKGROUND

In December 2021, Henrico County Detective Joseph Wechsler worked with an FBI joint task force investigating commercial sex trafficking and online solicitation of minors. On December 28, 2021, Detective Wechsler posted on an escort website called Mega Personals posing as a 16-year-old girl named Kelly. Through his experience investigating sex crimes, Detective Wechsler knew that content posted on Mega Personals related exclusively to commercial-sex transactions.

Detective Wechsler titled Kelly's post as "Looking for a Daddy," and the body of the post stated as follows:

> I'm looking for someone who can help me with this game. I'm new and need to make some money but I don't want to get hemmed up. I just need someone who can show me the ropes and watch my back. NOT A SUGAR DADDY NO LAW, NO BS, PERIOD!!

The post listed Kelly's age as "99yo." Detective Wechsler also included a clothed picture of a female Henrico police officer with the face blacked out.

Detective Wechsler selected Fayetteville, North Carolina as the location for Kelly's post; the backstory he created for Kelly was that she wanted to run away from Virginia to North Carolina and earn money in the commercial sex trade. Detective Wechsler explained that, in the context of an escort site, Kelly's statement that she was looking for a "daddy" meant that she was seeking a pimp. Detective Wechsler listed Kelly as 99 years old to prompt questions from responders about her age. Mega Personals did not allow direct messaging through the site, so Detective Wechsler included a telephone number with a Virginia area code connected to a phone he controlled.

Later that day, Watson texted the listed number, "Kelly text ASAP love I got you prettybaby." Detective Wechsler, as Kelly, responded, "Yeah?" Watson replied that he had just moved to Fayetteville and could teach her "the game" so they could make money together. Kelly stated that she was in Richmond, Virginia, but was trying to "get down" to Fayetteville.

After Kelly asked how much "bread" she could make, Watson responded that he had to see her to know what kind of clients they could attract. Detective Wechsler sent Watson a clothed picture of the Henrico officer with her face visible. Watson sent a picture of himself and stated that his name was "Fresh." When Kelly asked if Watson had "done this before," he responded, "Yes you could say that."

Approximately ten minutes after Watson's initial message, Detective Wechsler, as Kelly, texted, "I ain't trying to lie. I believe in honesty. I'm 16 so I don't wanna lie to you. I hope you don't care. I just need to get outta here. You feel me?" Ninety seconds later, Watson responded, "Of course I wish I would've ran into you 2 months ago." He elaborated that two months ago, he could have "put [her] up" in his home but had since lost that residence.

Watson texted, "Let me see your body if that's not a problem." At Watson's request, Detective Wechsler sent another picture of the clothed female officer and, as Kelly, explained that she was with her sister and would take more pictures for Watson when the sister left. Kelly asked what she would "have to do with the guys." He responded that it would depend on what they wanted and what she would allow. But he emphasized that she would "have [to] fuck and suck." When Kelly stated that she did not want to "fuck without a condom," Watson agreed that "ain't shit going down with[out] no condom." Kelly also asked whether Watson would keep some of the money that she earned. Watson responded that he would because he would protect her, and she would not want to be "in a room with strange men and a bunch of money." Kelly also stated that she did not have an identification card that said she was 18 years old. Watson responded, "That's simple to figure out love."

On December 29, 2021, Kelly told Watson that she could come to North Carolina after her sister returned to Roanoke. She asked how much money she could make, and Watson replied that it depended on how much she worked. He asserted that she would start at $150 "every time." On

December 30, Kelly texted Watson that her sister was leaving soon and asked if Watson "still want[ed] to help" her. He responded that "[o]f course" he did.

Detective Wechsler did not text Watson again for several days. On January 3, 2022, Watson texted, "Yo," and "See how you act I just been watching you smh [i.e., shaking my head]." Kelly did not respond that day, and on January 4, Watson texted, "Wow." On January 5, Kelly apologized and stated that she had gotten stuck in the snow.

On January 9, 2022, Kelly asked Watson if he still wanted to "fuck with [her]." Watson responded, "Yeah," but claimed that Kelly was "playing around" because she had not sent him pictures of her body. Detective Wechsler sent Watson a picture obtained from the FBI showing a woman's buttocks clad in a revealing undergarment. Watson responded that the picture looked good but asked her to "show the front." He also sent a picture of his penis.

Detective Wechsler sent another FBI picture of a female wearing a bra. Watson then asked for a picture of Kelly's genitalia. When Kelly expressed reluctance, Watson reiterated that he needed to know everything about her and reminded her that he had sent a picture of his genitalia.

Kelly asked if Watson could pick her up the following Tuesday. He responded that he needed to see "all of" her so he could know "how to market" her. Watson also stated that four days earlier, he met a girl named "Syn" who was "doing good" and making $500 to $1,000 per day. Watson represented that Kelly would live with Syn when she arrived in Fayetteville.

Throughout January 9 and 10, Watson continued to ask Kelly for more pictures. Detective Wechsler sent another picture of the clothed female officer and an FBI picture of a female in a bra and underwear. Watson sent another picture of his penis. In the evening of January 10, Watson texted that Syn had a suggestion for Kelly to take a train to North Carolina because, according to Watson, Syn did not want Watson driving to Virginia if Kelly was not "real." Watson sent a screenshot of an Amtrak schedule and offered to pay for the ticket.

- 4 -

On January 11, Kelly asked if Watson really would send her the train ticket, and he responded that he would. Watson's last text to the undercover phone was at 7:43 p.m. on January 11. On January 14, Detective Wechsler texted, as Kelly, "What's up with tomorrow? Or were you just playin?" Watson never responded.

Detective Wechsler ran Watson's phone number through databases of open records to discover Watson's identity. He also matched Watson's North Carolina DMV photograph to a picture Watson had sent. Watson was arrested in North Carolina and brought to Henrico County.

During an interview with Detective Wechsler and Detective Corey Jones, Watson denied exchanging text messages with Kelly. But when Detective Wechsler confronted him with the photos he had sent, Watson admitted that they showed his face and his penis. He also acknowledged that he often visited escort sites and "talk[ed] to a lot of girls."

Detective Wechsler obtained a search warrant for Watson's phone and recovered the text thread between Watson and the undercover phone.[3] Detective Wechsler also found over 400 internet searches that led to escort websites.

At trial, Detective Wechsler testified that several dozen individuals responded to Kelly's initial posting via text message. Detective Wechsler, as Kelly, told every responder early in the conversation that she was 16 years old. Many responders attempted to dissuade Kelly from participating in the commercial sex trade, some threatened to report her to the police, and others just ended the conversation. Detective Wechsler did not attempt to reengage any of those individuals.

---

[3] Detective Wechsler also discovered text messages between Watson and a number saved as "Syn" in his phone from approximately the same period of Watson's conversation with Kelly. Syn referred to Watson as "daddy" and sent him several nude or partially nude photos. When Detective Wechsler ran Syn's pictures through law enforcement databases, he discovered that they were posted online in multiple "[a]ctive escort ads." Detective Wechsler also saw that Watson had sent Syn pictures similar to those he had sent Kelly.

Watson was the only person who continued communicating with Kelly after learning that she was 16 years old.

The Commonwealth introduced the text messages between Watson and Kelly. Detective Wechsler testified about the communications, as did Detective Jones, who qualified as an expert in investigations of commercial sex trafficking and online solicitation of minors. Detective Jones opined that Watson used "grooming" language to build trust with Kelly and attempted to manipulate Kelly with guilt.

Watson presented no evidence in his defense. He asked the court to give the "model [jury] instruction for entrapment." He asserted that the police "plac[ed] the ad" and "develop[ed] the" communication and "enterprise" with him. The court refused Watson's proffered instruction. It explained that "[n]o one has to respond to" advertisements like the one that Detective Wechsler posted. The court also emphasized that "tons of people" initially responded but "the second" they learned that Kelly was 16 years old, they stopped communicating. Thus, the court concluded, Watson's conduct was "a voluntary thing after that" and not the result of entrapment. The jury convicted Watson on all counts.

ANALYSIS

Watson assigns error to the court's refusal of his proffered jury instruction on entrapment. Generally, "the matter of granting and refusing jury instructions rests 'in the sound discretion of the trial court.'" *Pena Pinedo v. Commonwealth*, 300 Va. 116, 121 (2021) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). A trial court abuses its discretion if it fails "to consider a relevant factor that should have been given significant weight"; "consider[s] and giv[es] significant weight to an irrelevant or improper factor"; or "commits a clear error of judgment" when "weighing 'all proper factors.'" *Fields v. Commonwealth*, 73 Va. App. 652, 672 (2021) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 213 (2013)). This Court only finds an abuse of discretion

when "reasonable jurists could not differ." *Hicks v. Commonwealth*, 71 Va. App. 255, 275 (2019) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753 (2005)).

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues [that] the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "Although a defendant 'is entitled to an instruction upon his theory of the case,'" the defendant's proffered instruction must be "'supported by *some appreciable evidence*.'" *Williams v. Commonwealth*, 64 Va. App. 240, 246 (2015) (quoting *Harris v. Commonwealth*, 134 Va. 688, 695 (1922)). "Additionally, '[m]ore than a scintilla of evidence must be present to support an instruction.'" *Id.* (alteration in original) (quoting *Eaton v. Commonwealth*, 240 Va. 236, 255 (1990)). "Thus, it is not error to refuse an instruction when there is no evidence to support it." *Id.* at 247 (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001)). "[W]hen reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Dandridge v. Commonwealth*, 72 Va. App. 669, 676 (2021) (quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 260 (2018)).

Watson asked the court to give the "model [jury] instruction for entrapment," which is Criminal Model Instruction No. 52.400:

> Entrapment is the origination and planning of a crime by an officer of the law and his procurement of its commission by one who would not have committed it except for the trickery, persuasion or fraud of the officer. Where a person intends to and does commit the crime, the fact that officers of the law provided a favorable opportunity for, aided or encouraged the commission of the crime is not entrapment.
>
> If you believe:
>
> > (1) That the defendant had no previous intent or purpose to commit the crime; and

>    (2) That an officer of the law, directly or through his agents, originated in the mind of the defendant the idea to commit the crime; and
>
>    (3) That an officer of the law, directly or through his agents, caused the defendant to commit the crime by trickery, persuasion or fraud,
>
> then you shall find the defendant not guilty even though you may believe from the evidence that he consented to the commission of the crime.[4]

As reflected in the instruction, entrapment is an affirmative defense where the defendant establishes that law enforcement conceived of and planned the crimes and that he would not have committed them but for the "trickery, persuasion, or fraud of the officer." *McCoy v. Commonwealth*, 9 Va. App. 227, 231 (1989) (quoting *Stamper v. Commonwealth*, 228 Va. 707, 715 (1985), *superseded on other grounds as stated in Shaw v. Commonwealth*, 79 Va. App. 485, 512-16 (2024)); *see Mathews v. United States*, 485 U.S. 58, 62 (1988) (noting that entrapment is an affirmative defense); *Kilpatrick v. Commonwealth*, 73 Va. App. 172, 201 (2021) (same).

Entrapment requires "'creative activity' [by the police] that implants in the mind of an otherwise innocent person the disposition to commit an offense and induce its commission in order to prosecute." *McCoy*, 9 Va. App. at 231 (alteration in original) (quoting *Stamper*, 228 Va. at 715). By contrast, mere "[e]ncouragement or solicitation of the commission of a crime by one who is willing and predisposed to commit the crime does not constitute entrapment." *Id.* at 232. "[T]here is nothing improper in the use, by police, of decoys, undercover agents and informers to invite the

---

[4] The record does not contain the refused jury instruction, only Watson's in-court identification of it as the "model [jury] instruction for entrapment." On brief, the parties agree that Watson's proffered instruction was Instruction No. 52.400. There is no dispute over whether this instruction "correctly states the law," only whether the court erred in refusing it based on insufficient evidence. *Woolridge v. Commonwealth*, 29 Va. App. 339, 348 (1999) ("Although an instruction correctly states the law, if it is not applicable to the facts and circumstances of the case, it should not be given." (quoting *Hatcher v. Commonwealth*, 218 Va. 811, 813-14 (1978))).

exposure of willing criminals and to present an opportunity to one willing to commit a crime." *Shavin v. Commonwealth*, 17 Va. App. 256, 264 (1993) (alteration in original) (quoting *Schneider v. Commonwealth*, 230 Va. 379, 381 (1985)).

Whether a defendant was predisposed to commit the offense is "merely one circumstance to be considered in determining whether the intent to commit a crime is solely the product of police activity." *McCoy*, 9 Va. App. at 233. The evidence can establish a defendant's predisposition without showing that he "previously committed the same offense" as the one charged. *Id.* "Where one is predisposed to commit a criminal act and involvement by [police] influences the nature or degree of the crime, it cannot be said that the state provided an innocent person with the intent to commit a crime." *Id.*

Here, not a scintilla of evidence supported the entrapment instruction. *See Williams*, 64 Va. App. at 246. Viewed in the light most favorable to Watson, the evidence failed to show that Detective Wechsler caused an otherwise innocent person to use a communications system to solicit a minor for sex, or to engage in sex trafficking of a minor.[5] Rather, the evidence showed that Watson was "willing and predisposed" to commit those offenses. *McCoy*, 9 Va. App. at 232. Detective Wechsler's post was not targeted at Watson; it generally solicited individuals already looking at the escort site for advertisements and profit opportunities related to commercial sex transactions. As the court noted, every person who responded—including Watson—freely chose to do so.

---

[5] While Watson argues that a reasonable jury could have concluded that he knew that Kelly was not a 16-year-old girl, and only "pretend[ed] to engage" with her for his own sexual gratification, this contention addresses the sufficiency of the Commonwealth's evidence to prove he committed the offenses, but not whether he was entitled to a jury instruction on entrapment. Watson's assignment of error challenges only the court's denial of his proposed instruction, not the sufficiency of the evidence to sustain his convictions. *See* Rule 5A:20(c)(1) ("Only assignments of error listed in the brief will be noticed by this Court.").

Further, Detective Wechsler took steps to ensure that he investigated only individuals who were willing and predisposed to engage in solicitation and trafficking of minors. He informed every responder that Kelly was 16 years old. Watson was the only person who continued the conversation after receiving that information. Accordingly, Detective Wechsler remained in contact with only Watson. Additionally, Watson reinitiated contact with Kelly when Detective Wechsler did not text for four days in late December to early January, belying the notion that Detective Wechsler instigated the offenses.

The texts themselves further dispel any inference that Detective Wechsler ensnared an otherwise innocent person into a criminal scheme. Watson continuously and persistently demanded sexually explicit pictures of Kelly even after learning that she was only 16 years old. He also sent her unsolicited pictures of his penis. Further, as Watson conceded on brief, his texts repeatedly discussed the "opportunities and benefits" of the sex trade.

In sum, Watson has not shown more than a scintilla of evidence that demonstrated he committed the charged offenses only because Detective Wechsler pressured, tricked, or coerced him. *See id.* at 231. Thus, the evidence did not support Watson's proposed entrapment instruction, and the court properly refused it.

CONCLUSION

For these reasons, we affirm the circuit court's judgment.

*Affirmed.*